### *In re* JULIO IRVING RODRÍGUEZ TORRES

*Número:* MC-76-4          *Resuelto:* 31 de enero de 1978

*Marcos A. Ramírez, Marcos Ramírez Lavandero, Donato Rivera de Jesús* y *Juan R. Melecio,* abogados del Presidente del Senado de Puerto Rico, Hon. Juan Cancel Ríos; *Héctor M. Laffitte,* abogado del Hon. Luis A. Ferré, en su carácter de Presidente del Senado de Puerto Rico, quien presentó, unido al Lcdo. Marcos A. Ramírez, una Moción de Reconsideración de una Resolución del Tribunal Supremo de Puerto Rico de fecha 10 de marzo de 1977 declarando académico este recurso.

### RESOLUCIÓN

Se deja sin efecto la regla de incompatibilidad enunciada en el caso de epígrafe.

Lo acordó el Tribunal y certifica el señor Secretario. El Juez Presidente Señor Trías Monge emitió opinión a la cual se unen los Jueces Asociados Señores Dávila y Torres Rigual. El Juez Asociado Señor Martín emitió opinión separada. El Juez Asociado Señor Irizarry Yunqué emitió un voto particular. El Juez Asociado Señor Negrón García emitió una opinión disidente a la cual se une el Juez Asociado Señor Díaz Cruz. El Juez Asociado Señor Rigau no intervino.

(Fdo.) Ernesto L. Chiesa
*Secretario*

—o—

Opinión del Juez Presidente, Señor Trías Monge, a la cual se unen los Jueces Asociados Señores Dávila y Torres Rigual.

San Juan, Puerto Rico, a 31 de enero de 1978

En la opinión *per curiam* emitida en el caso de epígrafe, referente a determinadas querellas sobre la conducta profesional del licenciado Julio Irving Rodríguez, entonces Presidente de la Comisión de Nombramientos del Senado de Puerto Rico, hizo este Tribunal el pronunciamiento siguiente:

"En virtud de nuestra facultad constitucional e inherente de reglamentar la profesión de abogado, y en el ejercicio de nuestra indelegable obligación de irle dando contenido concreto a los principios enunciados en el Código de Ética Profesional, resolvemos que existe una insalvable incompatibilidad en el ejercicio de la abogacía ante los tribunales de primera instancia—directamente o mediante asociados o delegados—y el pertenecer a una Comisión del Senado que tenga a su cargo la consideración de nombramientos de jueces o fiscales . . . ."

En escrito ante nos, el señor Presidente del Senado de Puerto Rico alega esencialmente que debe dejarse sin efecto la citada regla de incompatibilidad porque la misma invade facultades y obligaciones que la Constitución del Estado Libre Asociado le reconoce al Poder Legislativo.

Tan grave planteamiento exige el examen de diversas cuestiones. Importa en primer término identificar los problemas suscitados por el abogado legislador que resuelve continuar el ejercicio activo de la abogacía y describir los métodos tradicionalmente ensayados para su solución. Tan solo con el beneficio del trasfondo resultante es que debemos acercarnos al tema de la validez y prudencia de la regla de incompatibilidad. La contestación a estas interrogantes dependerá a fin de cuentas del concepto que esta Corte abrigue

sobre las funciones del Poder Judicial en nuestro esquema de gobierno y otros problemas de teoría jurídica.

1. *El legislador abogado y los conflictos de intereses. La experiencia en Estados Unidos.*

Reseñemos inicialmente la experiencia estadounidense por la influencia de su derecho constitucional sobre el nuestro en esta materia. Las cámaras legislativas norteamericanas se han nutrido en gran medida de abogados. De 1790 a 1930 casi dos terceras partes del Senado y alrededor de la mitad de la Cámara de Representantes de los Estados Unidos se componían de abogados. Hurst, *A History of the Principal Agencies of Law in the United States*, 1950, pág. 352. La proporción no ha disminuido perceptiblemente. Walker, *The Legislative Process: Lawmaking in the United States*, 1948, pág. 150; American Bar Foundation, *The Lawyer as Legislator*, Research Memorandum No. 21, agosto de 1960, pág. 2 y ss.

Esta situación dio lugar a la creación de notorios conflictos de intereses y numerosos escándalos públicos. El propio Daniel Webster, mientras era senador, representó a una institución bancaria en cuarenta y un casos ante el Tribunal Supremo de los Estados Unidos y aun ejerció presiones reconocidamente indebidas en favor de tal institución sobre miembros del Poder Ejecutivo. Mayer, *The Lawyers*, 1966, pág. 12. Otros legisladores abogados de la época fueron denunciados públicamente por el uso de influencia indebida. Kirby, *Congress and the Public Trust*, Report of the Special Committee on Congressional Ethics, Bar Association of the City of New York, Atheneum, N.Y., 1950, pág. 80 y ss. En años recientes la conducta de varios abogados congresistas ha sido objeto de dura crítica. Pearson & Anderson, *The Case Against Congress*, 1968, págs. 101–127. El tema continúa atrayendo considerable atención. Rhodes, *Enforcement of Legislative Ethics: Conflict Within the Conflict of Interest Laws*, 10 Harv. J. of Leg. 373 (1973). Para literatura adi-

cional, véanse: National Municipal League, *Preliminary Bibliography on Conflict of Interest and Ethics in Government*, 1970; Walker, *The Legislative Process: Lawmaking in the United States*, 1948; Shils, *The Legislator and his Environment*, 18 U. Chi. L. Rev. 571 (1950).

El resultado práctico ha sido, en Estados Unidos y varios otros países, que buena parte de la literatura jurídica y cientificopolítica alude a los estándares éticos relativamente bajos que prevalecen en muchos parlamentos. Schmidhauser, *An Institutionalization of Legislatures and Judiciaries*, en Kornberg, A., ed., *Legislatures in Comparative Perspective*, N.Y., 1973, pág. 128. Con referencia especial al Congreso de Estados Unidos, véase: Keefe, W. J. & Ogul, M. S., *The American Legislative Process: Congress and the States*, 2ª ed., Prentice Hall, 1968, págs. 5–11.

2. *Los métodos empleados en Estados Unidos para la solución del problema.*

Los métodos utilizados se desarrollan dentro de un marco constitucional específico. Antes de examinar dicho marco exploremos los referidos métodos. El argumento más antiguo en esta materia—todavía se le repite curiosamente en ocasiones aisladas, aunque de modo cada vez más débil—es que es innecesario disponer de mecanismo alguno para supervisar o reglamentar la ética de los legisladores, ya que los legisladores deben someterse periódicamente al escrutinio del electorado. La realidad ha demostrado que tal escrutinio no ha sido suficiente. Note, *Conflicts of Interest of State Legislators*, 76 Harv. L. Rev. 1209, 1213–14 (1963); Kirby, *Congress and the Public Trust*, Report of the Special Committee on Congressional Ethics, Bar Association of the City of New York, Atheneum, N.Y., 1950, pág. 23 y ss. Tampoco lo han sido las sanciones de índole penal que a veces se han impuesto. Rhodes, *Enforcement of Legislative Ethics: Conflict Within the Conflict of Interest Laws*, 10 Harv. J. of Leg. 373, 384 (1973). La teoría de que el Congreso o las asambleas legisla-

tivas estatales pueden atender el problema de modo *ad hoc* mediante la utilización de sus poderes de censura y expulsión de sus miembros, sin utilizar comisiones o códigos formales de ética, ha fallado también en dar el esperado fruto. Rhodes, *supra*, 389, 392; Note, *Conflicts of Interest of State Legislators*, 76 Harv. L. Rev. 1209, 1211–13 (1963).

Tal situación llevó al Congreso de Estados Unidos, tras largos años de debate, a establecer comisiones permanentes de ética legislativa y a aprobar códigos de conducta. La comisión del Senado fue nombrada en 1965 y en 1968 el Senado aprobó un Código de Ética. La comisión y el código de la Cámara de Representantes datan ambos de 1968. Kirby, *supra*, 215 y ss. Por espacio de muchos años legisladores distinguidos habían sugerido en vano la aprobación de estas medidas. Douglas, Paul H., *Ethics in Government*, Harvard Univ. Press (Godkin Lectures), Cambridge, 1952.

Muchos estados de la Unión Americana se adelantaron al Congreso en la aprobación de estas medidas. Note, *supra*, 76 Harv. L. Rev. 1209, 1230 (1963). Para 1969 y 1970, treinta y dos asambleas legislativas adicionales estaban considerando activamente propuestas al mismo efecto. Rhodes, *supra*, pág. 375, notas 10ª y 11ª. También se produjeron para estos años códigos modelos sobre el particular. *A Conflict-of-Interests Act*, 1 Harv. J. of Leg. 68 (1964); *Conflicts of Interests: A New Approach*, 18 U. Fla. L. Rev. 675 (1966). En 1966 el propio Tribunal Supremo de los Estados Unidos había recalcado la importancia de que el Congreso hiciese uso de su poder disciplinario. *United States* v. *Johnson*, 383 U.S. 169 (1966).

La literatura actual sobre el tema muestra cierto desencanto aun con el establecimiento de comisiones legislativas permanentes para juzgar la conducta de los legisladores y la formulación de cógidos de ética. Se ha estado tendiendo a recomendar el establecimiento de comisiones independientes del Poder Legislativo para enfrentarse al antiguo problema

de los conflictos de intereses en este campo. Note, *supra*, 76 Harv. L. Rev. 1209, 1231 (1963); Rhodes, *supra*, 393 y ss. Este enfoque ha sido adoptado por varios estados. Hawaii, por ejemplo, cuenta con una Comisión de Ética nombrada por el Gobernador, compuesta de cinco miembros de entre diez nominados por el Consejo Judicial. Los miembros no pueden ser legisladores o desempeñar cargo gubernamental alguno que conlleve compensación. Hawaii Rev. Stat. sec. 84–21. (¹)

No hemos hallado instancia alguna en Estados Unidos en que el Poder Judicial se haya arrogado la facultad, sin beneficio de estatuto, de convertirse en árbitro moral de la conducta de los legisladores.

La preocupación creciente en Estados Unidos con el problema de los conflictos de intereses está alterando las normas de conducta de los legisladores abogados. En el Congreso de Estados Unidos ya una mayoría de ellos, por autodisciplina, no dedica tiempo alguno al ejercicio privado de su profesión. Kirby, *supra*, 97 y ss. La recomendación de ciertos colegios de abogados es que debe exigirse la abstención total. *Ibid.*, 234. La situación en los estados no es tan halagüeña debido a la persistencia en muchas jurisdicciones de la teoría del legislador de tarea parcial y sueldo insuficiente.

Más tarde exploraremos si las circunstancias prevalecientes en Puerto Rico, junto al ordenamiento jurídico imperante, requieren y permiten que la Rama Judicial, contrario a lo sucedido en Estados Unidos, intervenga, en el ejercicio de su facultad supervisora de la conducta de los abogados, con la organización y funciones de las cámaras legislativas. Antes de abordar esta cuestión, investiguemos los parámetros jurídicos del problema en el derecho estadounidense, modelo en este caso de nuestra reglamentación orgánica.

---

(¹) No hacemos pronunciamiento alguno sobre los problemas constitucionales que puede plantear esta solución. Véase nuestra discusión de *United States* v. *Brewster*, 408 U.S. 501 (1972), en la tercera parte de esta opinión.

3. *La inmunidad legislativa en la Constitución de Estados Unidos*

El Art. I, Sec. 6, *in fine*, de la Constitución de Estados Unidos dispone en su versión original:

". . . and for any Speech or Debate in either House, they [los miembros del Congreso] shall not be questioned in any other place."

Esta cláusula ha jugado incuestionablemente un papel de singular importancia en defender la independencia del Poder Legislativo dentro del sistema de separación de poderes. Ella ayuda a explicar la resistencia tradicional de los tribunales estadounidenses a intervenir en problemas de disciplina legislativa y el consiguiente desarrollo de los métodos alternos de control que hemos descrito.

La cláusula de inmunidad legislativa (*the speech or debate clause*) es de antigua estirpe. Sus orígenes se remontan a las luchas entre la Corona y el Parlamento de Inglaterra en los siglos XVI y XVII. Maitland, *The Constitutional History of England,* 1926, pág. 241 y ss.; Wittke, C., *The History of English Parliamentary Privilege,* 1970; Reinstein & Silvergate, *Legislative Privilege and the Separation of Powers,* 86 Harv. L. Rev. 1113, 1120–21 (1973). La Corona, ayudada por los jueces, intervenía a menudo en las expresiones y otras actuaciones oficiales de miembros del Parlamento. El encarcelamiento de Sir John Eliot en 1629 por oponerse en un discurso ante la Cámara a la guerra contra Francia exacerbó los ánimos y provocó eventualmente el establecimiento del privilegio en 1641 por declaración parlamentaria. Reinstein & Silvergate, *supra,* 1128. La Carta Inglesa de Derechos de 1869 lo consagró definitivamente. 1 W. & M. Sess. 2, c. 2 (1689). El lenguaje de la cláusula de inmunidad de la Constitución de Estados Unidos sigue de cerca el de la Carta Inglesa de Derechos. Hubo cambios, no obstante, en el esquema del que forma parte la cláusula de inmunidad. La Convención

Constituyente despojó al Congreso del poder de desacato([2]) y redujo el ámbito de los poderes de exclusión y expulsión, poderes considerados como contrapesos de la cláusula de inmunidad. Kirby, *Congress and the Public Trust*, Report of the Special Committee on Congressional Ethics, Bar Association of the City of New York, Atheneum, N.Y., 1950, págs. 202–03.

El privilegio de inmunidad legislativa se interpretó desde sus comienzos por las cortes estadounidenses en modo abarcador. En *Coffin* v. *Coffin*, 4 Mass. 1, 27 (1808), afirmó el tribunal:

"Se consagraron estos privilegios, no con el propósito de proteger contra procesos a los legisladores para su propio beneficio, sino para sostener los derechos del pueblo mediante la seguridad a sus representantes de cumplir los deberes de su cargo sin temor a enjuiciamiento penal o civil. Considero por tanto que el artículo no debe interpretarse estrictamente sino en forma liberal, de modo que responda a su amplio diseño. Yo no limitaré su ámbito a la expresión de un punto de vista, el pronunciamiento de un discurso o el intercambio en un debate; lo extiendo a la función de votar, a la presentación de informes escritos y a cualquier otro acto que fluya de la naturaleza o ejecución del cargo de legislador. Defino el privilegio como medida que escuda a un legislador de procesamiento por cualquier cosa dicha o hecha por él en el descargo de sus funciones oficiales, sin inquirir si actuó debida o impropiamente conforme a las reglas de la Cámara . . . ."

La Corte Suprema de Estados Unidos citó con aprobación este pasaje en *Kilbourn* v. *Thompson*, 103 U.S. 168, 203–204 (1880). Ya antes, en *Fletcher* v. *Peck*, 10 U.S. 87, 130 (1810), la Corte Suprema había señalado la improcedencia de cuestionar las motivaciones de las actuaciones oficiales de los legisladores. Al mismo efecto: *Tenney* v. *Brandhove*, 341 U.S. 367, 377 (1951).

---

([2]) Sobre la posesión por el parlamento del Reino Unido de este extraordinario poder, desconocido hasta hoy en otros países europeos, véase: Wheare, *Legislatures*, Oxford U. Press, 1963, págs. 87–89.

En *United States* v. *Johnson*, 383 U.S. 169 (1966), el Tribunal Supremo resolvió que la cláusula de inmunidad legislativa torna en inadmisible incluso prueba de que la razón que tuvo un legislador, acusado de conspiración para cometer fraude contra Estados Unidos, al pronunciar un discurso en favor de las compañías de préstamos era que fue sobornado. Sobre los orígenes y propósitos de la cláusula recordó el Tribunal:

"No fue únicamente el temor al Poder Ejecutivo lo que preocupó al Parlamento sino el miedo al Poder Judicial también, ya que los jueces eran a menudo lacayos de los monarcas estuardos ..." 383 U.S. 169, 181.

Sobre esta afirmación particular se ha comentado recientemente:

"El hecho de que los jueces no tiendan hoy a ser lacayos de nadie no reduce el peligro de que interfieran por iniciativa propia con el funcionamiento del Congreso."

Suárez, *Congressional Immunity: A Criticism of Existing Distinctions and a Proposal for a New Definitional Approach*, 20 Vill. L. Rev. 97, 135 (1974).

Los principios centrales que las decisiones citadas establecen no han sido esencialmente alterados en casos posteriores. Véanse: *United States* v. *Brewster*, 408 U.S. 501 (1972); *United States* v. *Gravel*, 408 U.S. 606 (1972); *Doe* v. *McMillan*, 412 U.S. 306 (1973); *Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491 (1975).

Dos conclusiones resaltan del repaso de la historia e interpretación de la cláusula de inmunidad de la Constitución estadounidense: hasta ahora se ha estimado que la cláusula es precioso baluarte de la integridad e independencia del proceso legislativo y los tribunales se han resistido a achicar significativamente su ámbito y mucho menos a invadirlo. Ello explica en parte el modo en que se ha preferido atender tradicionalmente en Estados Unidos el problema de los conflictos de intereses de los legisladores abogados. No se ha conside-

rado aconsejable hasta el momento intentar resolver tales conflictos—o parte de estos conflictos, que es a lo más que podría aspirarse—mediante la invocación del poder inherente de las cortes, allí donde se le reclama, (3) a reglamentar el ejercicio de la abogacía.

La doctrina de la separación de los poderes, base teórica del privilegio de inmunidad legislativa, ha influido también independientemente en la estructuración de los métodos que prevalecen en Estados Unidos para la reglamentación de la conducta de los legisladores. Antes de proceder a su examen debemos hacer, no obstante, una observación sobre cierta tendencia que comienza a apuntar en el análisis de la cláusula de inmunidad legislativa.

En *United States* v. *Brewster*, 408 U.S. 501 (1972) y algunos casos posteriores se percibe que soplan brisas de cambio. Se determinó en *Brewster* que podía acusarse a un senador de aceptar un soborno a cambio de su promesa de efectuar ciertos actos oficiales. Concluyó el Tribunal que, distinto a la situación en *United States* v. *Johnson*, 383 U.S. 169 (1966), podía probarse la comisión del delito sin necesidad de inquirir en la naturaleza del acto legislativo o la motivación para realizarlo. En el curso de su decisión el Tribunal dejó expresamente abierta la posibilidad, sin pasar juicio sobre su validez, de que por ley del Congreso se permitiese al Tribunal inquirir en los actos oficiales y motivaciones de los legisladores. 408 U.S. 501, 529, nota 18. Los jueces Brennan y Douglas combatieron este *dictum* en su opinión disidente por considerar que el privilegio de inmunidad legislativa es

---

(3) Desde temprano en el siglo este Tribunal ha ejercitado la facultad para reglamentar y supervisar el ejercicio de la profesión de abogado en Puerto Rico. *Coll* v. *Leake*, 17 D.P.R. 857 (1911), *In Re Casablanca*, 30 D.P.R. 399 (1922); *In Re Tormes*, 30 D.P.R. 267 (1922). Como admite el Presidente del Senado en su alegato, "[D]icho poder ya está establecido y constituye un aspecto aceptado de nuestro sistema jurídico." 38 Rev. C. Abo. P.R. 7–15 (1977).

reclamable por cada legislador aun en contra de la voluntad del cuerpo legislativo.

Esta observación no sacude las conclusiones generales reseñadas anteriormente. Ayuda a recordar, sin embargo, que la naturaleza del derecho no es estática, que aun sus reglas más establecidas pueden ceder, con el correr del tiempo, a las fuerzas generadas por nuevas realidades.

4. *Impacto de la doctrina de separación de poderes.*

La doctrina de separación de poderes no significa que el gobierno se divide en tres compartimientos cerrados, sin conexión o dependencia entre ellos. *Banco Popular* v. *Corte*, 63 D.P.R. 66, 71–72 (1944). El desarrollo histórico de la doctrina no apoya la interpretación de que ella exige una separación absoluta entre los tres poderes. Fairlie, J. A., *The Separation of Powers*, 21 Mich. L. Rev. 393 (1922); Lalumiere & Demichel, *Les Régimes Parlamentaires Européens*, París, 1966, pág. 3 y ss.; opinión del Juez Rigau en *P.P.D.* v. *Ferré, Gobernador*, 98 D.P.R. 338 (1970). Consúltese igualmente el excelente alegato radicado en el caso de autos en representación del Senado de Puerto Rico. *La Regla de Incompatibilidad y la Separación de Poderes*, 38 Rev. C. Abo. P.R. 7, 52 y ss. (1977).

Las fuentes que históricamente se le han asignado a cada rama del gobierno no poseen todas carácter necesariamente inmutable. Existe variedad en su naturaleza. La relación entre las ramas está sujeta a alteraciones que dependen de las necesidades de los tiempos y la índole del poder de que se trate. Puede distinguirse entre facultades que integran la entraña misma del sistema y poderes trasladables, por razones de peso, a otras ramas. El ritmo de cambio en cuanto a las primeras, hasta donde puede darse el cambio sin dañar el sistema, es generalmente mucho más lento que en cuanto a las segundas. La realidad es que la relación entre las diversas ramas del gobierno en sociedades que aceptan la teoría de la separación de poderes es en gran medida de orden dinámico.

Según ha señalado Laski, quien rechazaba por ineficaz el concepto clásico de una separación absoluta de los poderes a la par que abogaba por el reconocimiento de ciertos principios esenciales: "Estamos comenzando a entender que la autoridad debe posarse allí donde puede ser más sabiamente ejercitada para el bien común." Laski, *Authority in the Modern State*, 1919, págs. 236, 243. Véase también: Laski, *The Foundation of Sovereignty*, 1921, pág. 243.

De ahí que la relación entre los focos tradicionales del poder haya variado en modo tan pronunciado en Estados Unidos. Fairlie, *supra*, 436. Esto explica también la irrupción del Poder Judicial en campos históricamente reservados a otras ramas. *Brown* v. *Board of Education*, 349 U.S. 294 (1955); *Baker* v. *Carr*, 369 U.S. 186 (1962); Abraham, H. J., *The Judiciary*, 4ª ed., 1977, pág. 181. Tal parece que la Constitución, al igual que la naturaleza, aborrece el vacío.

Semejante verdad no debe conducirnos a error. Determinadas circunstancias históricas pueden provocar que el tribunal otorgue un significado más amplio o restringido a ciertas cláusulas de la Constitución. Tal hecho suscita siempre opiniones encontradas en cuanto a la prudencia o acierto de la decisión tomada pero rara vez ataca la legitimidad misma del poder ejercido. Ese poder no es otro que el de revisión judicial.

Lo anterior no justifica que en aras de corregir una situación considerada indeseable nos abrogásemos los jueces un poder que la Constitución ha depositado en otra rama del gobierno. El deseo de satisfacer los reclamos de reforma del pueblo no nos autoriza a traspasar los límites que al ejercicio de nuestra autoridad ha impuesto el mismo documento que nos la otorga. La Constitución es la expresión más solemne de la voluntad del pueblo y a sus preceptos debemos lealtad absoluta, aun cuando esa lealtad nos obligue a abstenernos de formular una norma que consideremos apropiada o incluso, indispensable. Véase: Kurland, P., *Mr. Justice Frankfurter*

*and the Supreme Court,* Univ. of Chicago Press, 1971. Como ha expresado el Juez Brennan:

"The Court is not a council of Platonic guardians for deciding our most difficult and emotional questions according to the Justice's own notions of what is just, wise or politic. To the extent that this is a governmental function at all, it is the function of the peoples' elected representatives." Brennan, W., *Inside View of the High Court,* New York Times Magazine, Oct. 6, 1963, pág. 35.

Esto es particularmente cierto cuando hablamos de la intervención del tribunal en el campo de lo ético. Según se ha indicado:

"Of course, not everyone agrees on moral goals, much less ones that are judicially attainable. The nine justices cannot be expected to march in happy unanimity toward a legal heaven whose definition all applaud." Lewis, C., *The Changing Role of the Supreme Court of the U.S.A.,* 51 Ill. Bar Journal 21 (1962).

Por estas razones, entre otras, en Estados Unidos el Poder Judicial ha considerado impropio hasta ahora arrogarse la función de regir la conducta de los legisladores, aunque se trate de legisladores abogados, cuando hacerlo podría interferir con sus funciones como representantes del pueblo. Como ha ocurrido en Inglaterra, se vacila en interpretar la regla del imperio de la ley en modo que convierta a los jueces en oráculos de un derecho superior. Laski, *Parliamentary Government in England,* 1938, pág. 368. La posibilidad de cambio está siempre presente—hemos hecho alusión anteriormente, al discutir la regla de inmunidad, a algunas leves señales—pero las condiciones del momento apuntan a la improbabilidad e indeseabilidad de que los tribunales estadounidenses resuelvan reducir en modo dramático el significado corriente del privilegio de inmunidad legislativa.

Razones de considerable peso han llevado a las cortes, tanto a las activistas como a las moderadas, a moverse con extrema cautela cuando se trata de expandir su poder a costa

de los dominios de las otras dos ramas. El principio de la independencia judicial, a la par que protege a la judicatura de intervención indebida por los otros poderes, la aísla de la opinión pública y del electorado. Los errores judiciales son de difícil corrección. Sólo cuando la Constitución lo exige ineludiblemente bajo el azote del tiempo y el cambio en las necesidades sociales es que las cortes deben penetrar en zonas históricamente reservadas a los representantes del pueblo.

Corresponde ahora examinar la situación en Puerto Rico para resolver si nuestro ordenamiento constitucional requiere un tratamiento del problema en discusión diferente al desarrollado en Estados Unidos.

5. *El legislador abogado. La experiencia puertorriqueña.*

Desde tiempos de nuestro primer Senado, electo el 16 de julio de 1917, muchos abogados militaron en sus filas. En el primer Senado, siete de sus diecinueve miembros (36.8%) eran abogados y dos ingresarían a la profesión después. En 1936 la proporción era igual. Para el tiempo de la Convención Constituyente nueve senadores de diecinueve (47.36%) eran letrados.

Desde 1936 ya era objeto de discusión intensa el problema de los posibles conflictos de intereses de los abogados legisladores. En tal año el Colegio de Abogados de Puerto Rico publicó una nota editorial en que comentaba favorablemente lo dispuesto en la Constitución de Filipinas de 1935 sobre el asunto. (⁴) *La Influencia del Legislador sobre los Tribunales*

---

(⁴) El Art. VI, Sec. 8, inciso (2) de la Constitución filipina de 8 de febrero de 1935, ratificada en plebiscito el 14 de mayo de 1935, disponía en su versión original:

"No Member of the National Assembly shall directly or indirectly be financially interested in any contract with the Government or any subdivision or instrumentality thereof, or in any franchise or special privilege granted by the National Assembly during his term of office; nor shall any such Member appear as counsel before the Electoral Commission or any court in any civil case wherein the Government or any subdivision or instrumentality thereof is the adverse party, or collect any fee for his appearance in any administrative proceedings or in any criminal case wherein

*de Justicia*, 1 Rev. de Derecho, Leg. y Jur. del Col. de Abog. de P.R., Núm. 6, págs. 3–7 (1936). Recomendaba legislación el Colegio para resolver los conflictos de intereses que a su juicio existían. Para facilitar la desvinculación del legislador abogado de actividades profesionales privadas se sugería también la aprobación de remuneración adecuada para todos los miembros de la Asamblea Legislativa.

El interés público en este problema continuó manifestándose. El 9 de marzo de 1951 once distinguidos senadores presentaron el P. del S. 134 para proveer solución legislativa al problema. No se tomó acción sobre este anteproyecto, pero

---

an officer or employee of the Government is accused of an offense committed in relation to his office. No Member of the Commission on Appointments of the National Assembly shall appear as counsel before any court inferior to the Supreme Court."

La Constitución de la Segunda República Filipina, aprobada durante la ocupación japonesa el 4 de setiembre de 1943, fue más lejos, disponiéndose en su Art. IX, Sec. 7, que ningún funcionario o empleado público podría dedicarse al ejercicio de su profesión privada durante el término de su cargo. La Constitución de la Tercer República, ratificada en plebiscito el 11 de marzo de 1947, limitó esta prohibición absoluta en su Art. VI, Sec. 17, la cual dispone:

"No Senator or Member of the House of Representatives shall directly or indirectly be financially interested in any contract with the Government or any subdivision or instrumentality thereof, or in any franchise or special privilege granted by the Congress during his term of office. He shall not appear as counsel before the Electoral Tribunals or before any court in any civil case wherein the Government or any subdivision or instrumentality thereof is the adverse party, or in any criminal case wherein an officer or employee of the Government is accused of an offense committed in relation to his office or collect any fee for his appearance in any administrative proceedings, or accept employment to intervene in any case or matter where he may be called upon to act on account of his office. No Member of the Commission on Appointments shall appear as counsel before any court inferior to a collegiate court of appellate jurisdiction."

Para estos textos, véase: Zaide, G. P., *Philippine Constitutional History and Constitutions of Modern Nations*, Manila, 1970, págs. 329–330, 357, 367.

Tal era el estado de la Constitución filipina para el tiempo en que se redactó la del Estado Libre Asociado de Puerto Rico. Para la Constitución actual de la República Filipina (1972), que difiere del texto últimamente citado, véase: 10 Blanstein & Flanz, *Constitutions of the Countries of the World*, Oceana Publications, N.Y., 1973, Art. VIII, Sec. 11.

el mismo influyó en la posición asumida sobre este asunto en la Convención Constituyente que iniciaría sus trabajos pocos meses más tarde. 2 *Diario de Sesiones de la Convención Constituyente* 795.

La Convención Constituyente tuvo ante sí numerosas recomendaciones para restringir las actividades profesionales privadas del legislador abogado. La Escuela de Administración Pública estimaba que las disposiciones vigentes de la Ley Orgánica y del Código Político[5] eran muy insuficientes. Sugirió la Escuela:

"Estas leyes guardan silencio sobre el problema de si un legislador que sea abogado puede seguir ejerciendo libremente su profesión. Parece conveniente prohibir en forma expresa que un legislador abogado patrocine casos contra el gobierno de cuyas leyes es coautor. Como dijera John Quincy Adams en su *Diario*, 'se me ocurre que este doble carácter de abogado en corte y miembro de un cuerpo legislativo ofrece oportunidades y tentaciones para aceptar honorarios en contra de la pureza moral.' Durante muchos años existió en Estados Unidos la práctica de que los congresistas pudieran llevar, mediante honorarios, reclamaciones contra el gobierno sin que tal cosa provocara críticas ni censura. Pero en 1853 el Congreso legisló para hacer de esta práctica un delito menos grave. En nuestra isla, con muy raras excepciones, los legisladores abogados continúan ejerciendo libremente su profesión, aun en casos contra el gobierno y en juicios por jurado. No cabe duda de que esto tiende a favorecer a su cliente, restándole pureza a los procedimientos judiciales por virtud de su influencia como legislador, que se ofrece como consecuencia necesaria de su presencia en la defensa, aun cuando no haya la intención de utilizarla. Creemos que en bien del interés público deben insertarse en nuestra Constitución disposiciones reglamentando la participación de los legisladores como abogados en casos contra el gobierno de que son parte y en casos de juicios por jurado sobre el que puede influir fácilmente la mera presencia del legislador."

---

[5] Art. 30 de la Ley Jones; Art. 16 del Código Político.

*La Nueva Constitución de Puerto Rico*, Ed. U.P.R. 1954, pág. 373. (⁶)

En el seno de la Convención se alzaron autorizadas voces en apoyo de severas restricciones a la actividad profesional de los abogados legisladores. Los señores Ferré, García Méndez, Soto, González Blanes, Colón Castaño, García Delgado y Veray, Jr., propusieron que se incluyese en la Constitución el siguiente lenguaje:

". . . Ningún legislador postulará en los tribunales o ante cualquiera dependencia del Gobierno ni representará ningún interés particular ante cualquier de las dependencias del Gobierno mediante paga durante el término para que haya sido electo."

Proposición Núm. 103 de 16 de octubre de 1951, Art. XXXV. (⁷)

El señor Gelpí presentó otra propuesta análoga en que se proveía:

"8. Ningún miembro de la Legislatura podrá ser consultor, abogado de personas naturales o jurídicas que tengan contratos con el Gobierno de Puerto Rico o con sus municipios, incluyendo el Gobierno de la Capital.

9. Ningún miembro de la Legislatura podrá tramitar ni dirigir asuntos de terceras personas ante las autoridades administrativas del Gobierno Insular o en los Tribunales de Justicia."

La Comisión de la Rama Legislativa consideró específicamente estas propuestas antes de evacuar su informe. 4 *Diario de Sesiones de la Convención Constituyente* 2577. Es conveniente recordar, además, que don Heraclio Rivera Colón,

---

(⁶) El informe contentivo de esta y otras recomendaciones le fue sometido formalmente a la Comisión de la Rama Legislativa por el doctor Pedro Muñoz Amato en las vistas públicas celebradas por ésta el 11 de noviembre de 1951. *Informe de la Comisión de la Rama Legislativa,* mimeo, 1951, pág. 83. El *Diario de Sesiones de la Convención Constituyente* publicó tan solo parte del informe de las comisiones.

(⁷) Copia de estas propuestas se hallan en el Archivo General de Puerto Rico.

coauspiciador del P. del S. 134 antes mencionado, era miembro de la Comisión.

Según se desprende del Informe de la Comisión, las partes citadas de las Proposiciones 103 y 154 no hallaron acogida en el mismo, como tampoco las recomendaciones de la Escuela de Administración Pública. La Comisión resolvió recomendarle a la Convención Constituyente que se limitase a reiterar, con una leve variante, las incompatibilidades que establecía la Ley Orgánica vigente. (8) 4 *Diario de Sesiones de la Convención Constituyente* 2580.

En el curso de los debates en la Asamblea Constituyente los señores Rivera Colón y Gelpí intentaron nuevamente que se ampliasen las incompatibilidades prescritas por la Ley Jones. El señor Gelpí determinó ensayar una enmienda, más limitada que la encarnada en su Proposición 154, y el señor Rivera Colón la respaldó e intentó ampliarla de nuevo. 2 *Diario de Sesiones de la Convención Constituyente* 796 y ss. Se retiró eventualmente la enmienda de los delegados. 2 *Diario de Sesiones de la Convención Constituyente* 1334.

La intención de la Asamblea Constituyente de no alterar por vía de la Constitución el *status quo* en esta materia se revela con igual claridad al examinarse el tratamiento de la cláusula de inmunidad parlamentaria. (9) La Escuela de Ad-

---

(8) Véase el Art. 30 de la Ley Jones.

(9) Tal principio se reconoció también en las constituciones españolas que rigieron en Puerto Rico. El Art. 128 de la Constitución de 1812 expresaba que "Los diputados serán inviolables por sus opiniones, y en ningún tiempo ni caso, ni por ninguna autoridad, podrán ser reconvenidos por ellas . . . ." El Art. 46 de la Constitución de 1876 expresaba, en modo análogo a nuestra Constitución actual: "Los senadores y diputados son inviolables por sus opiniones y votos en el ejercicio de su cargo." Idéntico principio se proclamó en el Art. 25 de la Carta Autonómica de 1897. En la tradición jurídica española, esta inviolabilidad de los diputados por sus expresiones y votos se considera técnicamente en modo tan lato como el privilegio correspondiente inglés. Carro Martínez, A., *Derecho Político*, 3ª ed., Madrid, 1965, pág. 300 y ss.

El Código Político de 1902, de fuente norteamericana, proclamó el

ministración Pública, luego de discutir a *Kilbourn* v. *Thompson*, 103 U.S. 203 (1880) y otros antecedentes y materiales, concluyó que "todo cuerpo legislativo debe hacer cuanto esté a su alcance para asegurar la dignidad de su propia conducta y el prestigio de sus miembros", *La Nueva Constitución*, 377, pero que debía limitarse el privilegio. "En sus orígenes," señaló la Escuela, "[este] representó un arma contra la opresión real, pero la desaparición de los factores históricos que le dieron vida nos lo muestra hoy como una institución anticuada en muchos aspectos." *Loc. cit.*

En la Proposición Núm. 40 el señor Arcilio Alvarado apoyó la restricción del privilegio. El Decano del Colegio de Derecho de la Universidad de Puerto Rico, señor Rodríguez Ramos, respaldó, del otro lado, una enmienda al Art. 34 de la Ley Orgánica para que el delito de soborno no se castigase por las cortes del modo especificado en dicha Ley, sino por la propia Asamblea Legislativa, la que debería a su juicio quedar enteramente libre para imponer su propia sanción. *Informe de la Comisión Legislativa*, mimeo (incluyendo el récord de las vistas públicas), págs. 77–78.

La Comisión Legislativa y eventualmente la Convención eliminaron la antigua referencia de la Ley Orgánica al soborno, no acogieron las recomendaciones de la Escuela de Administración Pública ni la propuesta de Alvarado y reforzaron en vez el privilegio de inmunidad legislativa. El Art. III, Sec. 14, de nuestra Constitución provee:

"Ningún miembro de la Asamblea Legislativa será arrestado mientras esté en sesión la cámara de la cual forme parte, ni durante los quince días anteriores o siguientes a cualquier sesión, excepto por traición, delito grave, o alteración de la paz; y todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones en una u otra cámara o en cualquiera de sus comisiones."

---

mismo principio. 2 L.P.R.A. sec. 12. En el Art. III, Sec. 14, de la Constitución del Estado Libre Asociado es que la norma recobra carácter constitucional.

Es interesante observar que la Convención Constituyente amplió las recomendaciones de la Comisión Legislativa en dos sentidos: se extendió el limitado privilegio contra arrestos a los quince días anteriores o siguientes a cualquier sesión y se recalcó que la inmunidad parlamentaria cubre no solamente las expresiones sino también los votos que se emitan en cualquier cámara o comisión de la misma. En el estudio que se prepara a raíz de la Convención para hacer constar las fuentes de las disposiciones acordadas se señala la íntima conexión entre la Sec. 14 recién citada y las cláusulas de inmunidad de las constituciones estadounidenses. Con la excepción de cinco estados, se indica, las constituciones de los estados restantes y del gobierno federal contenían disposiciones análogas. *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, Washington, D.C., 1952, págs. 64–65. La Convención tuvo ante sí el texto de estas y otras constituciones. *Ibid.*, 5. La Sec. 14 del Art. III de nuestra Constitución entronca claramente con las cláusulas de inmunidad parlamentaria de la tradición anglosajona. La jurisprudencia interpretativa de este género de cláusula le era familiar también a la Convención. *La Nueva Constitución de Puerto Rico*, Ed. U.P.R., 1954, págs. 373–378; comparecencia del doctor Santos P. Amadeo, vista de 11 de noviembre de 1951, *Informe de la Comisión de la Rama Legislativa*, pág. 57 y ss.

No deben pasar inadvertidos otros dos actos de la Convención Constituyente que están estrechamente relacionados con la decisión de excluir del texto de la Constitución disposiciones limitadoras de las actividades profesionales de los abogados legisladores y que ayudan a explicar lo ocurrido. El primero, de extraordinaria trascendencia, fue el cambio efectuado en el concepto mismo de la función de legislar y de entender la naturaleza de los cuerpos legisladores. La Sec. 10 del Art. III expresó en modo simple la dramática alteración: "La Asamblea Legislativa será un cuerpo en carácter con-

tinuo durante el término de su mandato . . . ." Lo dispuesto representaba una variación fundamental de lo incluido en la Ley Orgánica vigente. 4 *Diario de Sesiones de la Convención Constituyente* 2582. La literatura de la época favorecía generalmente el concepto de que, al igual que las funciones hermanas de ejecutar e interpretar las leyes, la de adoptar las leyes debía constituir un proceso continuo, de tarea completa. *Loc. cit.* [10]

El segundo acto, secuela del anterior, consistió en despejar el camino para que la Asamblea Legislativa pudiese fijarles remuneración adecuada a sus miembros, contrario a lo que sucedía bajo el Art. 31 de la Ley Orgánica. Este fue el propósito de la disposición correspondiente de la Sec. 11 de la Ley Orgánica. 4 *Diario de Sesiones de la Convención Constituyente* 2580.

El diseño que se desprende de todo lo anterior es claro. Se estaba reteniendo y aun fortaleciendo el privilegio de inmunidad parlamentaria y se dejaba intocado el ámbito de las incompatibilidades que conllevaba el cargo de legislador, pero se facilitaba a la vez acción por la Asamblea Legislativa para evitar excesos y corregir viejos males. No hay base sólida en el historial de la Convención Constituyente para concluir que en momento alguno se pensó que la Rama Judicial debía convertirse en regente moral de la actuación de los legisladores en su capacidad oficial, función ignorada en el Puerto Rico de aquellos años. Los trabajos de la Convención Constituyente revelan más bien el celo de sus miembros en dotar al país de un Poder Legislativo revestido de la más alta dignidad e independencia, sujeto a los frenos tradicionales que conlleva la teoría de la separación de poderes. Lo que en resumen ocurrió fue que la Convención Constituyente aceptó

---

[10] Se había abogado por este cambio en Puerto Rico desde unos años antes de convocarse la Convención Constituyente. Véase: Trías Monge, J.: *Legislative and Judicial Reorganization in Puerto Rico*, tesis doctoral inédita, Universidad de Yale, 1947, Caps. II y VII.

parte de las recomendaciones formuladas por el Colegio de Abogados en 1936. La atención de las otras sugestiones, la determinación de los métodos para remediar los problemas que a entender de muchos creaba el ejercicio privado de su profesión por los abogados legisladores se depositó en manos de la Asamblea Legislativa. Veamos lo que ocurre luego.

6. *La inacción legislativa local.*

El problema actual nace de que nada fundamental ha ocurrido. Ha habido intentos esporádicos de autodisciplina y llegó a formularse un proyecto de Código de Ética, ([11]) pero los esfuerzos para el establecimiento de normas e instituciones correctivas han resultado fallidos. Puerto Rico se encuentra en estos momentos, después de más de cuarenta años de debate del problema, en la situación perturbadora de andar a la zaga de la gran mayoría de los estados federados y de continuar lidiando todavía con las dificultades que históricamente ha generado el ejercicio de su profesión privada por el abogado legislador. El diseño constitucional no se ha cumplido. La facultad de acción que tan precariamente se mantuvo en manos del Poder Legislativo yace en desuso. No se han establecido Comisiones Permanentes de Ética. No se han aprobado Códigos de Ética. No se han adoptado estatutos para resolver los conflictos de intereses que les surjan a los legisladores. No se ha intentado establecer una comisión independiente, fuera de la Asamblea Legislativa, para ocuparse del problema.

El establecimiento por esta Corte de la regla de incompatibilidad respondió sin duda a la alarma que necesariamente produce esta situación insólita. Las cuestiones que plantea el actual recurso están revestidas de tal gravedad; su solución puede afectar mecanismos tan delicados de nuestro sistema de gobierno, que es nuestro deber ineludible, sin embargo, reexa-

---

([11]) Véase el escolio 2 de la opinión en este caso del distinguido compañero, Hon. Antonio S. Negrón García.

minar la validez y aconsejabilidad presentes de la referida norma.

### 7. *Consideraciones finales.*

De todo lo anterior se desprende que nuestro ordenamiento constitucional le preservó ancho campo al privilegio de la inmunidad parlamentaria, al menos tan ancho como se le reconoce en la jurisprudencia de Estados Unidos. Esto no quiere decir que los legisladores no pueden ser procesados por los delitos que se les imputen. Su posición en este sentido es idéntica a la de cualquier otro ciudadano. Lo que significa la inmunidad parlamentaria en este particular es únicamente que no podrán utilizarse como prueba en su contra en el proceso correspondiente las expresiones, votos y otros actos oficiales del legislador. El Poder Judicial retiene intacto su poder de disciplina en todo lo que ataña la conducta profesional privada del abogado legislador.

Nuestro desenvolvimiento constitucional demuestra, en segundo término, que nuestra Convención Constituyente no deseó establecer ella misma regla alguna de incompatibilidad. No se acogieron las distintas propuestas al efecto. No hay indicio fehaciente de interés de privar a la Asamblea Legislativa de su poder tradicional de autodisciplina y de asignarle esta función a la Rama Judicial.

Queda por ver si la prolongada inacción legislativa en este campo justifica el ejercicio por el Poder Judicial de la facultad no utilizada hasta ahora por el Poder Legislativo de disciplinar a sus miembros. Hay varias razones contrarias a esta solución. Nuestra Constitución no la contempla. No fue la intención histórica permitirla. Desconocemos una expansión parecida del Poder Judicial en otras jurisdicciones, angloamericanas o civilistas. Tal expansión tendría serias repercusiones en el balance de poder entre las diversas ramas del gobierno. Se estaría permitiendo que la Rama Judicial gobernase la composición de una o más comisiones de la Asamblea Legislativa, en grave detrimento de su independencia. Esto no

se curaría con alterar la regla de incompatibilidad y prohibir tan solo que los abogados legisladores voten para la confirmación de jueces y fiscales. Ello violaría el texto expreso de la cláusula de inmunidad, amén de intervenir con la más sagrada de las facultades de un legislador.

Hay otras objeciones fundamentales a la regla de incompatibilidad, algunas de índole práctica y otras que van a la médula de la función judicial en una sociedad regida por el sistema de separación de poderes.

La regla, en primer término, no penetra el corazón del problema que ha venido preocupando a sectores significativos de nuestra sociedad por tan largo tiempo. No hay indicación en el récord de que las dificultades experimentadas arrancan exclusivamente, o aun siquiera de modo principal, de la participación de los abogados legisladores en las labores de la Comisión de Nombramientos. La evidencia histórica indica que el problema es más lato. Ha causado zozobra la intervención de algunos legisladores abogados en pleitos contra entidades gubernamentales, su representación remunerada de unidades del gobierno, su decisión de postular ante agencias administrativas, su propia comparecencia ante los tribunales en distintos géneros de casos, su voluntad de continuar, en suma, el ejercicio privado de su profesión. La regla de incompatibilidad roza una porción tan solo de este vasto universo.

La referida regla muestra al desnudo, en segundo lugar, el limitado poder de las cortes para enfrentarse debidamente a esta problemática. Como se ha señalado anteriormente, al examinar los enfoques desarrollados en Estados Unidos, los tribunales podrían a lo sumo atender estos asuntos de modo esporádico y *ad hoc*. La naturaleza de nuestro sistema no garantiza que las omisiones del Poder Legislativo en este campo puedan corregirse por el Poder Judicial. ¿Qué base existe para presumir que unos jueces percibirán indefectiblemente, con mayor finura y precisión que los legisladores, las

exigencias éticas de cada época respecto al comportamiento oficial de los senadores y representantes del país?

Esto nos lleva a las objeciones de naturaleza teórica. En *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977), reiteramos la ineludible función de este Tribunal de ser intérprete final de la Constitución. Nos tocó allí examinar las fronteras del poder de las cámaras legislativas para pasar juicio sobre la validez de la elección de sus miembros. Resolvimos que el poder cuestionado allí reside en las cámaras, pero que no es absoluto; que su ejercicio no puede vulnerar ciertas garantías constitucionales básicas. La labor que nos impone este recurso es de aun mayor delicadeza. Se trata aquí de fijar el límite de un poder nuestro y en particular de un poder bautizado por la propia Rama Judicial como de naturaleza inherente. Una situación de esta índole requiere el ejercicio de la máxima ponderación y mesura por parte del Poder Judicial. A la luz del análisis efectuado en secciones anteriores, es inescapable concluir, como hicimos en *Santa Aponte*, que nuestros poderes también conocen fronteras. La propia vastedad de los poderes confiados a la Rama Judicial exige moderación y cautela en su ejercicio. Roche, *Judicial Self-Restraint*, 49 Am. Pol. Sc. Rev. 762, 763–764 (1955); Lusky, *By What Right? A Commentary on the Supreme Court's Power to Revise the Constitution*, The Michie Co., Va., 1975, págs. 4–5; Strum, *The Supreme Court and 'Political Questions'*, Univ. of Ala. Press, 1974, págs. 1, 142. Existe considerable peligro en utilizar el poder de revisión judicial más allá de lo estrictamente necesario. Lusky, *supra*, 41, 50 y ss.; Cox, A., *The Role of the Supreme Court in American Government*, 1976, pág. 103. Cuando se trata del ejercicio de un poder inherente hay motivo para redoblar las precauciones. *Ibid.*, 22.

Nada de lo expresado significa que un tribunal puede o debe rehuir o achicar sus funciones de principal intérprete y custodio de la Constitución. Lo que significa es que dentro

de nuestro sistema de separación de poderes, donde la relación entre éstos es necesariamente de orden dinámico, las tres ramas que integran el gobierno viven en posición de continuo conflicto potencial que solo puede evitarse, por el bien común, mediante el empleo por cada cual de extrema circunspección y cuidado en el ejercicio de sus atribuciones.

Tampoco debe interpretarse lo expuesto como expresiones absolutas sobre las bondades relativas del activismo y la modestia o moderación judiciales. Como se ha señalado por muchos, es difícil y poco aconsejable generalizar sobre este asunto. Los criterios y enfoques pueden variar de materia a materia y aun de época a época. Abraham, *The Judiciary*, 4ª ed. 1977, pág. 181 y ss.; Shapiro, *Law and Politics in the Supreme Court*, MacMillan, 1964, págs. 328–329.

El análisis efectuado indica que nuestro ordenamiento constitucional presente no admite la intervención por este Tribunal en la organización por las cámaras de sus comisiones ni en el modo en que un legislador ejerza su facultad de votar sobre cualquier asunto oficialmente ante el cuerpo. Aun bajo la hipótesis, no validada, de que ello fuese posible, lo aconsejable sería que esta Corte se abstuviese de todos modos, al menos por el momento, de pronunciarse sobre el asunto bajo discusión. La propia insistencia del Presidente del Senado, tanto del antiguo como del actual, en intervenir en este recurso es prueba fehaciente a nuestro juicio del interés de la Cámara Alta en atender directamente los problemas que entendiblemente han alarmado a este Tribunal. No es razonable interpretar que se está reclamando un poder con la intención de no ejercerlo y mantener a la Asamblea Legislativa de Puerto Rico lastimosamente a la zaga de otras jurisdicciones. El propio interés del actual Presidente del Senado en que se atendiesen por la Convención Constituyente los problemas que plantea el abogado legislador es índice de la voluntad de intentarlo prontamente. En tales circunstancias, la deferencia debida a otra rama gubernamental indepen-

diente nos lleva al mismo resultado, aunque por vía de abstención, a que llegamos en ausencia de la referida hipótesis.

Por las consideraciones expuestas es que debe dejarse sin efecto la regla de incompatibilidad.

—O—

Opinión emitida por el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 31 de enero de 1978

La Resolución del Tribunal deja sin efecto la norma que declara incompatible el ejercicio de la abogacía ante los tribunales de primera instancia y el pertenecer a una Comisión del Senado que tenga a su cargo la consideración de nombramientos de jueces y fiscales. Concurro con tal resultado. Me mueve a concurrir con el resultado el hecho de que la norma de incompatibilidad en la forma en que fue redactada es de muy poco valor práctico, es muy limitada y contiene la semilla de problemas mayores que los que se resuelven. Tengo la convicción, sin embargo, de que el Tribunal conforme a su poder inherente de reglamentar la conducta de los abogados, de cuyo poder no están exentos los abogados legisladores, debió haber extendido la norma ética a todos los abogados que a su vez sean legisladores y ampliarla para impedir además la postulación ante las distintas agencias gubernamentales y organismos cuasi judiciales. Comparto el criterio expresado en la disidencia del Juez Asociado Señor Negrón García en cuanto al poder inherente de este Tribunal para el establecimiento de una norma ética al respecto.

El razonamiento contenido en la opinión del Juez Presidente Señor Trías Monge para dejar sin efecto la norma de incompatibilidad a mi entender deja de tener validez si se extiende y amplía la norma en la forma que propongo, ya que entonces la postulación de los abogados legisladores no se hace depender de su intervención o no intervención en ciertas funciones internas legislativas en su carácter de legislador.

Cualquier insinuación de que estamos imponiendo disciplina legislativa se desvanecería prontamente.

Aunque los cánones de ética profesional vigentes deberían ser suficientes para alertar a los abogados que son legisladores que su postulación como abogados en representación de ciudadanos particulares puede constituir conducta antiética, considero que los problemas que presenta tal postulación son tan evidentes que se impone singularizar los abogados legisladores como grupo e incluirlos en un canon aparte para señalar cierta conducta intrínseca que está en pugna con los postulados de ética profesional.

Paso a analizar primeramente la razón de ser de los cánones de ética profesional aprobados por este Tribunal, y luego expondré los argumentos en que me baso para sostener el poder inherente que tiene este Tribunal para aprobarlos y promulgarlos:

"En Puerto Rico, donde el sistema democrático es fundamental para la vida de la comunidad y donde la fe en la justicia se considera factor determinante en la convivencia social, es de primordial importancia instituir y mantener un orden jurídico íntegro y eficaz, que goce de la completa confianza y apoyo de la ciudadanía.

La consecución de estos fines le impone a los miembros de la profesión jurídica, sobre quienes recae principalmente la misión de administrar la justicia y de interpretar y aplicar las leyes, el deber de desempeñar su alto ministerio con la mayor y más excelsa competencia, responsabilidad e integridad." Preámbulo, Código de Ética Profesional, 4 L.P.R.A. Ap. IX, Tomo 1A, Suplemento 1977, pág. 518.

La cita precedente corresponde a los dos párrafos introductorios del Preámbulo de los Cánones de Ética Profesional que rigen la conducta profesional de los abogados que ejercen en Puerto Rico. Dichos cánones fueron adoptados por el Colegio de Abogados de Puerto Rico y aprobados por este Tribunal por estimar que constituyen normas de conducta tendientes a situar el ejercicio de la abogacía en el plano elevado y fecundo

en que debe desarrollarse. Resolución, Tribunal Supremo de Puerto Rico, 24 de diciembre de 1970.

Recae sobre este Tribunal la grave y delicada responsabilidad de velar por que las actuaciones de los abogados para con la sociedad, con los tribunales, con sus clientes y con sus compañeros respondan a su alto ministerio y a la conducta moral que se espera de todo miembro de la profesión legal quienes a su vez tienen la obligación de vigilar "porque los distintos procesos legales de la sociedad incorporen y consagren de manera efectiva y adecuada los principios de vida democrática y de respeto a la inviolable dignidad del ser humano." Véase Criterio General, Deberes del Abogado para con la Sociedad. 4 L.P.R.A. Ap. IX, Tomo 1A, Suplemento 1977, pág. 516.

Los principios aludidos precedentemente, incorporados a los Cánones de Ética Profesional de los abogados en Puerto Rico, han de ser observados por éstos, tanto en sus vidas privadas de ciudadanos como en su capacidad profesional, ya sea como juez, fiscal, abogado postulante ante los tribunales de justicia o ante organismos legislativos o administrativos, asesor, o en cualquier otro carácter. Véase Criterio General, Deberes del Abogado para con la Sociedad, 4 L.P.R.A. Ap. IX, Tomo 1A, Suplemento 1977, pág. 516; Canon 6 de los de Ética Profesional. El espíritu que permea los cánones exige que los abogados cobren conciencia de la importancia de evitar aun la apariencia de conducta impropia. Preámbulo, *supra*, pág. 518; Canon 38 de los de Ética Profesional, *supra*, pág. 535.

Comprende, además, el Código de Ética Profesional una prohibición al efecto de que ni siquiera pueden violarse los cánones por medios indirectos o mediante el empleo de terceros. Preámbulo, *supra*, pág. 518. Específicamente el Canon Núm. 6 considera impropio de un abogado el ocultar su gestión profesional ante organismos legislativos o administrativos mediante el empleo de terceros o de medios indirectos

para promover determinada acción gubernamental en interés de su cliente. 4 L.P.R.A. Ap. IX, C. 6, Suplemento 1977, pág. 520. También exige el citado Canon 6 a los abogados que ejercen su profesión y que además ocupen un cargo legislativo o gubernamental que antepongan el interés público al de sus clientes cuando ambos vengan en conflicto e inmediatamente renuncien la representación del cliente.

Al referirse a los abogados que ocupan un cargo público o político, también el Canon 11 les previene de que deben de abstenerse de ejercer influencia o presión indebida en la tramitación de cualquier asunto sometido a la consideración judicial. Canon 11 de los de Ética Profesional, *supra*, pág. 522.

Un examen de los preceptos citados refleja las normas mínimas que los abogados deben a la sociedad para mantener el honor e integridad de la profesión legal. Por ser aplicables a todos los abogados son por definición aplicables también a los abogados que ocupan cargos públicos. Estos últimos no están inmunes de su cumplimiento.

En el caso de autos el Tribunal al enjuiciar ciertas actuaciones como abogado de un legislador que a su vez era Presidente de la Comisión de Nombramientos del Senado de Puerto Rico hizo el siguiente pronunciamiento.

"En virtud de nuestra facultad constitucional e inherente de reglamentar la profesión de abogado, y en el ejercicio de nuestra indelegable obligación de irle dando contenido concreto a los principios enunciados en el Código de Ética Profesional, resolvemos que existe una insalvable incompatibilidad en el ejercicio de la abogacía ante los Tribunales de Primera Instancia—directamente o mediante asociados o delegados—y el pertenecer a una Comisión del Senado que tenga a su cargo la consideración de nombramientos de jueces o fiscales . . . ."

Luego del referido pronunciamiento, el señor Presidente del Senado expresó su deseo de que le permitiéramos "presentar un escrito para discutir la resolución de incompatibilidad, a la luz de las facultades y obligaciones constitucionales del Se-

nado de Puerto Rico y de los derechos y obligaciones constitucionales de sus miembros." El Presidente del Senado no cuestiona el poder de este Tribunal para investigar las actuaciones profesionales de los abogados y para disciplinarlos cuando actuasen indebidamente, aun si fueren legisladores. Al efecto expresó afirmativamente en su comparecencia que su intervención en este caso no tiene relación alguna con lo decidido sobre la conducta profesional del abogado envuelto. El Tribunal consideró allí que la conducta observada por el referido abogado en los trámites de ciertos casos ante los tribunales y por su indebida intervención con un compañero abogado, merecía una censura enérgica y así lo hizo.

La cuestión central que plantea la comparecencia del señor Presidente del Senado de Puerto Rico gira alrededor de la doctrina de separación de poderes, esto es, el balance que debe existir entre las tres ramas de poder público—Ejecutivo, Legislativo y Judicial.

Mi posición es que no existe conflicto alguno como tal entre el poder legislativo y el poder judicial en cuanto a la reglamentación del ejercicio de la profesión de abogado. El propio señor Presidente del Senado, aunque pone en duda como cuestión de derecho el poder inherente del Tribunal Supremo para reglamentar el ejercicio de la profesión de abogado, reconoce, sin embargo, que la realidad histórica es que dicho poder ya está establecido y constituye un aspecto aceptado en nuestro sistema jurídico.[1] Es sabido que tal poder existía antes de la adopción de la Constitución de Puerto Rico y a pesar de los intentos que se hicieron en la Convención Constituyente para que se consignara en la Constitución a quién

---

[1] *Coll* v. *Leake*, 17 D.P.R. 857 (1911); *In re Tormes*, 30 D.P.R. 267 (1922); *In re Casablanca*, 30 D.P.R. 399 (1922); *Boneta Ex parte*, 39 D.P.R. 154 (1929); *Ex parte Urrutia*, 43 D.P.R. 168 (1932); *Ex parte Jiménez*, 55 D.P.R. 54 (1939); *Guerrero* v. *Tribunal de Apelación*, 60 D.P.R. 241 (1942); *In re Bosch*, 65 D.P.R. 248 (1945); *In re González Blanes*, 65 D.P.R. 381 (1945); *In re Abella*, 67 D.P.R. 229 (1947); *In re Pagán*, 71 D.P.R. 761 (1950); *In re Liceaga*, 82 D.P.R. 252 (1961).

correspondía el poder, los miembros de la Constituyente no variaron la norma jurisprudencial reiterada sobre el poder inherente de este Tribunal al respecto.

El gobierno del Estado Libre Asociado de Puerto Rico goza de forma republicana al igual que el de los Estados Unidos y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por la Constitución de Puerto Rico están igualmente subordinados a la soberanía del pueblo de Puerto Rico. Art. I, Sec. 2, Constitución del Estado Libre Asociado de Puerto Rico. La propia Constitución dispone que ninguna enmienda podrá alterar la forma republicana de gobierno que por ella se establece, disponiendo además que cualquier enmienda o revisión deberá ser compatible con la resolución decretada por el Congreso de los Estados Unidos aprobando esta Constitución, con las disposiciones aplicables de la Constitución de los Estados Unidos, con la Ley de Relaciones Federales con Puerto Rico y con la Ley Pública 600 del Congreso Octogésimo-primero, adoptada con el carácter de un convenio. *Id.*, Art. VII, Sec. 3. Debe recordarse que las raíces de nuestro sistema judicial emanan de la jurisdicción estadounidense y por tanto del Derecho Común y no del Derecho Español.

En *United States* v. *Nixon,* 418 U.S. 683 (1974), el Tribunal Supremo de los Estados Unidos, al referirse al poder incuestionable de la rama judicial en la interpretación de la ley, expresó:

"En el desempeño de obligaciones constitucionales determinadas, cada rama del gobierno debe interpretar inicialmente la Constitución y la interpretación de sus poderes por cada rama merece gran respeto por parte de las otras. El abogado del Presidente, como hemos indicado, entiende que la Constitución le concede un privilegio absoluto de confiabilidad a todas las comunicaciones presidenciales. Muchas decisiones de este Tribunal, sin embargo, han reiterado inequívocamente la norma de *Marbury* v. *Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), que 'es positivamente atributo y deber de la rama judicial la determinación de

lo que significa la ley'." Pág. 703; véase *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977).

Conforme al desempeño de sus obligaciones constitucionales, el poder judicial de varias jurisdicciones estatales ha tenido oportunidad de pronunciarse sobre la facultad inherente del poder judicial para reglamentar la práctica de la profesión legal.

Así se ha declarado inconstitucional una legislación que autorizaba la admisión automática al ejercicio de la abogacía por interferir con el poder inherente de las cortes a prescribir las cualificaciones para admisión:

". . . Somos claramente de opinión que la ley de 1887, aunque no fuera así intencionada, constituye una invasión al departamento judicial del gobierno . . . . Es un mandato imperativo el admitir una persona para ejercer la abogacía mediante el cumplimiento de ciertas condiciones especificadas . . . . Ningún juez está obligado a admitir, ni puede ser compelido a admitir, a una persona a ejercer la abogacía que no esté debidamente cualificada, o cuya reputación moral sea mala . . . . El abogado es un oficial de la corte, y es colocado en una estrecha e íntima relación con la corte. Si ha de ser admitido, o si ha de ser desaforado, es una cuestión judicial y no legislativa." *In re Splane,* 16 A. 481 (Pa. 1889) ; véase *Board of Com'rs, Ala. St. Bar* v. *State ex rel. Baxley,* 324 So.2d 256 (Ala. 1975) ; *cf. In re Willis,* 215 S.E.2d 771 (N.C. 1975).

Antes de hacer la expresión precedente la misma corte de Pennsylvania había sostenido su facultad de establecer normas de conducta para los abogados, al decir:

"El poder de una corte para admitir a la práctica a un abogado, que fuese una persona que poseyere las cualificaciones requeridas, y a removerlo de esa posición si se convirtiere en indigno, ha sido reconocido por largo tiempo y no puede ser ya cuestionado. De hecho el poder de remoción por justa causa es tan necesario como el de su admisión para la debida administración de la ley. Al admitirlo la corte lo presenta al público como merecedor de su confianza en todos sus deberes y relaciones profesionales. Si luego la corte viene en conocimiento de que se ha

convertido en indigno, es su deber retirarle su endoso, y cesar en adelante de hacer creer que es merecedor de que se le encomienden gestiones profesionales." In re *Davies,* 93 Pa. 116 (1880).

La Corte Suprema de Massachusetts al reconocer el poder inherente de la rama judicial para determinar quiénes están cualificados para ejercer la abogacía y cuándo éstos cesan de estar cualificados ha expresado lo siguiente:

". . . El establecimiento del departamento judicial por la Constitución [de Massachusetts] le confirió autoridad necesaria para el ejercicio de sus poderes como un departamento de gobierno de igual rango. Constituye un poder inherente de dicho departamento de gobierno el de determinar en última instancia las cualificaciones de aquellos que han de ser admitidos a postular en sus cortes, la asistencia que ha de prestarles en su labor, y protegerse por tanto de los ineptos, de los que carecen de entrenamiento necesario y de aquellos que no posean buena reputación moral. El Juez Presidente Taney expresó suscinta y definitivamente en *Ex parte Secombe,* 19 How. 9, 13, 15 L.Ed. 565, 'Ha sido definitivamente establecido por las reglas y la costumbre de las cortes de Derecho común, que descansa exclusivamente en la corte el determinar quién está cualificado para ser uno de sus oficiales, como abogado y consejero, y los motivos por los cuales puede ser removido'." *In re Opinion of the Justices,* 180 N.E. 725 (Mass. 1932).

La Corte Suprema de Nebraska también se ha manifestado sobre el poder inherente en la forma siguiente:

"La Constitución [de Nebraska] no concede expresamente el poder de definir y regular el ejercicio de la abogacía a ninguno de los departamentos del gobierno. En la ausencia de una concesión expresa de ese poder a alguno de los tres departamentos, éste debe ser ejercitado por el departamento al que por naturaleza le pertenece toda vez que 'Es un principio fundamental de derecho constitucional que cada departamento de gobierno, bien sea federal o estatal, tiene, sin que se le haya concedido especialmente, el derecho inherente de realizar todos *los propósitos que naturalmente están dentro de la órbita del departamento,* que no estén limitados por el hecho de la existencia de un poder similar

en otro lado o por limitación expresa en la constitución' . . . [énfasis en original].

El deber primario de las cortes es la debida y eficiente administración de la justicia. Los abogados son oficiales de la corte y las autoridades que lo sostienen son legión. Ellos son en efecto una parte importante del sistema judicial de este estado. Es su deber de honestidad y competencia el ayudar a las cortes a obtener una administración eficiente de la justicia. La práctica del Derecho está tan íntimamente conectada y entrelazada con el ejercicio del poder judicial y la administración de la justicia que el derecho a definir y a regular dicha práctica pertenece naturalmente y lógicamente en el departamento judicial de nuestro gobierno estatal." *In re Integration of Nebraska State Bar Association,* 275 N.W. 265 (Nebr. 1937).

En Puerto Rico hemos establecido reiteradamente que la admisión al ejercicio de la abogacía es función inherente de este Tribunal. Véanse casos citados, escolio 1, pág. 729. Asimismo hemos reconocido nuestro poder inherente para disciplinar y desaforar a los miembros del foro. *In re Pagán,* 71 D.P.R. 761 (1950); *In re Abella,* 67 D.P.R. 229 (1947); *In re Bosch,* 65 D.P.R. 248 (1945).

En varias ocasiones hemos tenido la oportunidad de expresarnos sobre legislación adoptada por la Asamblea Legislativa para la reglamentación de la conducta de los abogados, su admisión al foro y medidas disciplinarias. En *Bosch,* supra, expresamos que la ley que crea el Colegio de Abogados, Ley Núm. 43 de 14 de mayo de 1932, según enmendada, 4 L.P.R.A. sec. 771 *et seq.,* constituye "legislación satisfactoria para ayudar a esta Corte en la reglamentación de admisiones al foro y de la conducta de sus miembros" y que sus disposiciones al respecto son directivas y no mandatorias. Pág. 251. Dijimos allí que "una vez que presta juramento como funcionario de esta Corte [un abogado], puede en cualquier momento ser llamado a responder por su conducta profesional para poder determinar esta Corte si nuestra resolución admitiéndolo debe dejarse sin efecto." Pág. 252. En *Liceaga,* supra, resolvimos que "las causas que para el desaforo de-

creta la Legislatura no excluyen nuestra facultad para orde-nar la separación de un abogado por otros motivos, *In re González Blanes*, supra, dijimos que 'incluye cuantos motivos justos puedan imaginarse'." Consideramos en *Liceaga*, supra, que el criterio que controla es uno de profilaxis social. Pág. 255. En *Pagán*, supra, al interpretar la ley creando la Comisión de Reputación de 11 de marzo de 1909 volvimos a decir que aparte de cualquier disposición legislativa que sería meramente directiva para este Tribunal, la remoción, al igual que la admisión al ejercicio de la abogacía, es facultad inherente de la rama judicial. Pág. 763.

La misma posición que ha adoptado este Tribunal sobre la legislación concerniente a la práctica de la abogacía ha sido asumida por otras jurisdicciones. En Illinois se ha resuelto que:

"El poder de reglamentar y definir la práctica de la abogacía es prerrogativa del departamento judicial como una de las tres divisiones del gobierno creadas por el Artículo 3 de nuestra constitución. El departamento legislativo puede aprobar leyes declarando ilegal y castigable el ejercicio no autorizado de la profesión. Tales estatutos son meramente en ayuda de, y no sustituyen ni disminuyen, el poder del departamento judicial de controlar la práctica de la profesión de abogado." *People ex rel. Chicago Bar Association* v. *Goodman,* 8 N.E.2d 941 (Ill. 1937).

En algunos casos en que las cortes se han enfrentado a ataques constitucionales de legislación relacionada con la conducta de los abogados por confligir la legislación con el poder inherente de los tribunales se ha anulado la legislación y en otros casos se ha sostenido por considerar que las normas del estatuto son mínimas y no excluyen el poder de los tribunales para establecer normas más rígidas.

El Tribunal Supremo de Arizona, por ejemplo ha establecido lo siguiente:

"Por las razones expresadas somos de opinión, primero, que esta Corte tiene jurisdicción original para oír cualquier procedimiento para desaforar un abogado que ha sido admitido a postu-

lar ante ella. Segundo, que el poder de desaforar un abogado por mala reputación o conducta anti profesional es inherente a la corte, y no es ni puede ser limitado ni retirado por la Legislatura, aunque ésta puede incluir otros motivos de desaforo que crea apropiados, y la corte los aceptará como suficientes. Tercero, que si apareciese que el abogado ha sido culpable de conducta inmoral o anti profesional de tal naturaleza que en la opinión de la corte sea incapaz de continuar ejerciendo, no es necesario que el procedimiento mediante el cual el asunto sea traído a la atención del tribunal cumpla con alguna forma en particular. Puede seguir el método delineado en el estatuto, y de ser así, la corte lo considerará suficiente, aun si la forma no cumpliere con el estatuto, si los cargos son tales que la corte considera buenas las razones de desaforo, independientemente del estatuto, y al abogado se le concede una oportunidad completa y adecuada de demostrar lo que estime procedente en su defensa, no se desestimarán los cargos por apartarse en alguna medida del método dispuesto por la Legislatura. Cuarto, que el affidavit unido a la petición contenga materias, que de ser ciertas, demuestren que el querellado es culpable de tal conducta impropia que lleve a esta corte a suspenderlo o desaforarlo." *In re Bailey,* 248 P. 29 (Ariz. 1926).

Una posición similar fue adoptada en Wisconsin al expresar:

"Aunque la Legislatura puede legislar con respecto a las cualificaciones de los abogados, su poder en ese respecto no emana de ningún poder que ella posee para tratar exclusivamente con el asunto de las cualificaciones de los abogados, pero es meramente incidental a su poder general e incuestionable de proteger el interés público. Cuando así legisla para fijar una norma sobre las cualificaciones requeridas a los abogados en ánimo de proteger el interés público, tales cualificaciones constituyen solo una norma mínima y limitan la clasificación de la cual la corte puede hacer su selección. Tales cualificaciones no constituyen las cualificaciones finales que impidan que el tribunal no pueda fijar cualificaciones adicionales que estime necesarias para la debida administración de las funciones judiciales. No hay poder legislativo que compela a las cortes a admitir a postular ante ellas personas incapaces de ejercer las prerrogativas de los abogados. El poder de la corte al respecto está limitado a la clasificación que

la Legislatura ha determinado es necesaria para la conservación del bien público." *In re Cannon*, 240 N.W. 441 (Wis. 1932).

También Utah ha reconocido que desde tiempo inmemorial el derecho a ejercer la profesión de abogado lo determina el poder judicial, al declarar:

"En adición a este privilegio [de postular ante los tribunales], se ha sostenido consistentemente que el derecho de la rama legislativa del gobierno para reglamentar y controlar los abogados está sujeto al poder inherente de la corte de finalmente controlar la admisión a la práctica y el desaforo . . . [en] In re Barclay, 82 Utah 288, 24 P.2d 302, 303, dijimos: 'Está bastante generalmente establecido que el poder es inherente en la corte apropiada para disciplinar, suspender o desaforar un abogado por mala conducta, independientemente de cualquier disposición expresa de un estatuto que confiera tal autoridad.' En respaldo a esto, citamos un caso anterior, In re Platz, 42 Utah 439, 132 P. 390, 392, en el que declaramos: 'Como tampoco puede la Legislatura limitar a las cortes en sus derechos para determinar las cualificaciones morales de sus oficiales o impedir la admisión de personas moralmente incompetentes al ejercicio de la práctica, ni obligarlas a retenerlas en las listas . . . . Las cortes, y no los jurados ni los legisladores, pueden en última instancia determinar las cualificaciones y aptitudes de sus oficiales.' La mayor parte de las jurisdicciones conceden que la Legislatura puede razonablemente reglamentar la admisión y desaforo de los abogados en el ejercicio de su poder de policía y en auxilio de los poderes de la corte, pero sostienen que el poder final de admisión o desaforo es inherente de los tribunales." *Ruckenbrod* v. *Mullins*, 133 P.2d 325 (Utah 1943).

En adición a las situaciones precedentemente discutidas los tribunales han tenido oportunidad de manifestarse en cuanto a la integración obligatoria de los abogados como requisito para el ejercicio de la profesión. En Wisconsin el Tribunal Supremo al expresarse sobre ese punto sostuvo que:

"Se ha sostenido por todas las cortes ante las que se ha planteado la cuestión que la corte tiene el poder de integrar a los abogados y que tal integración es una función judicial y no legis-

lativa." *Integration of the Bar Case,* 244 Wisc. 8, 11 N.W.2d 604 (Wis. 1943).

Al mismo efecto véanse: *Re Mundy,* 11 So.2d 398 (La. 1942); *Ayres* v. *Hadaway,* 6 N.W.2d 905 (Mich. 1942); *Petition for Integration of Bar,* 12 N.W.2d 515 (Min. 1943); *Johnson* v. *Childe,* 295 N.W. 381 (Nebr. 1941); *Re Integration of State Bar,* 95 P.2d 113 (Okla. 1939); Anno. 151 A.L.R. 617; American Bar Ass'n. Special Committee on Evaluation of Disciplinary Enforcement, Final Draft, June 1970.

Como puede verse por el análisis de la jurisprudencia sentada en varias jurisdicciones estatales y en nuestra propia jurisdicción, no debe haber duda alguna de que el poder judicial, en particular este Tribunal, tiene facultad para reglamentar la conducta que han de observar los abogados en el ejercicio de su profesión. Los Cánones de Ética Profesional adoptados por este Tribunal en 24 de diciembre de 1970, y que fueran sometidos por el Colegio de Abogados de Puerto Rico, [2] revelan la firme intención de este Tribunal de que los miembros de la profesión legal observen la conducta que garantice un orden jurídico íntegro y eficaz que goce de la completa confianza y apoyo de la ciudadanía. Cualquier desviación de las normas que los cánones establecen afecta la imagen del abogado como profesional y del sistema de justicia en general, trayendo como consecuencia la pérdida de fe de

---

[2] Al amparo del poder inherente de este Tribunal sotengo que· este Tribunal puede formular su propio Código de Ética para regir la conducta de los abogados. Nótese que la ley que crea el Colegio de Abogados, aunque autoriza al Colegio de Abogados a adoptar y establecer un Código de Ética Profesional, sujeta tal autorización a la aprobación del Tribunal Supremo. En otras palabras, este Tribunal ejerce su decisión final sobre el propósito, contenido y alcance de dicho Código. Ya dijimos en *Bosch,* supra, que las disposiciones de la referida ley son directivas y no mandatorias para este Tribunal. Es vital, sin embargo, que en el proceso de confeccionar los cánones de ética los abogados deben intervenir en la mayor medida posible, bien fuere haciendo proposiciones concretas o participando activamente en las deliberaciones que al efecto se celebren. No debe olvidarse que las determinaciones que finalmente se hagan al respecto afectan su función profesional.

los ciudadanos en el orden jurídico. Es por ello que debemos esforzarnos por mantener la limpieza en las ejecutorias de los abogados como ciudadanos, y en su capacidad profesional. Y en ese empeño, el de evitar aun la apariencia de conducta impropia.

El abogado que es a la vez legislador es depositario de la confianza de los ciudadanos en su dedicación para servir al interés público. Y, para conservar esa imagen, el abogado debe conducirse en tal forma que no haya duda que sus ejecutorias respondan a los más altos ideales y dentro de la mejor tradición de la profesión legal.

El abogado es parte esencialísima de la rama legislativa. En el pasado, y al presente, esa rama se ha nutrido de muchos abogados que han dejado su huella de honor, integridad y competencia en sus ejecutorias. Es necesario que continúe la ingerencia benéfica de abogados en la difícil y delicada tarea de ir dando forma al desarrollo de los programas sociales, económicos, de educación, de salud y de recreo y el mejoramiento de la calidad de la vida puertorriqueña. Solamente aquellos que sienten un compromiso con su pueblo y sus congéneres deben ser los atraídos a esa función ciudadana. Los sacrificios personales envueltos están más que compensados por la satisfacción derivada de servir a sus conciudadanos. Por ello es mi firme creencia que una norma de ética como la que propongo para los abogados legisladores no alejará a los abogados de talento, integridad y dedicación de la encomiable y envidiable misión de servir.

Su misión como legislador es promover la legislación que redunde en el mayor beneficio para el pueblo. En su función como legislador interviene en la formulación de política pública y por ello merece el respeto de sus conciudadanos. Por otro lado, casi por definición, está abanderizado a un partido político. El poder que ejerce como político y como hombre público en ocasiones es ominoso. Su influencia se deja sentir en todos los órdenes, voluntaria en algunos casos e in-

voluntaria en otros. Su mera presencia en cualquier actividad oficial es imponente. De esa realidad no podemos apartarnos.

La intervención de un abogado ante un tribunal de justicia o ante un organismo administrativo o cuasi judicial en representación de una de las partes lo aleja de su misión de legislador y lo envuelve en la lucha cotidiana de los ciudadanos por la defensa de sus pequeños o grandes intereses privados. Los intereses exclusivos de cada ciudadano particular muchas veces vienen en conflicto con los intereses públicos que el abogado viene obligado a defender en su delicada función de legislador y de hombre público. Su intervención necesariamente se hace sentir ante el funcionario de la rama judicial o de la rama ejecutiva cuyos nombramientos pueden haber sido objeto de su consideración en el pasado o pueden, a la expiración de sus cargos, volver a su consideración. Los presupuestos de los departamentos y agencias, así como las leyes que afectan favorablemente o desfavorablemente la gestión de los funcionarios públicos aludidos también son considerados por los abogados legisladores. Dadas esas circunstancias el abogado legislador no debe colocar a los funcionarios ejecutivos y judiciales en la posición en que deban decidir asuntos en que el abogado tiene un interés pecuniario, ya que al asumir la representación del ciudadano privado las más de las veces el abogado recibe algún tipo de compensación.

La preocupación por la intervención del abogado legislador en las disputas entre ciudadanos, pero en defensa de una de las partes, quiebra la confianza que en el proceso democrático tiene la parte adversa ya que de creer que su posición es la correcta, nadie puede convencerle, si es derrotado, que la mera presencia del abogado legislador no inclinó la balanza en su contra. Nada más intranquilizante para un litigante y para su abogado que el tener frente a sí como representante legal del adversario a un abogado legislador. Esa preocupación inevitable debe ser suficiente para que el abogado legislador se inhiba de participar contribuyendo así a que im-

peren en los procedimientos un clima de sosiego y de esperanza en la justicia que no se logra con su presencia. No creo necesario tener que abundar en este tema que ha sido objeto de amplios y constantes comentarios públicos a través de los años.

Más aún, el abogado legislador en la defensa de intereses privados no puede colocarse en la posición de tener que servir de orientador al tribunal en cuanto a la intención legislativa al aprobar tal o cual legislación, siendo ése muchas veces factor esencial para la resolución de la controversia.([3]) Ni tampoco debe estar ofreciendo a un tribunal, en beneficio de un ciudadano particular, su versión de cómo se debe interpretar una ley en particular. Su labor de hacedor de las leyes puede colocarle en una posición de ventaja aparente sin que necesariamente esté en lo correcto al hacer afirmaciones al respecto.

La rama legislativa, que es uno de los tres pilares de nuestra forma de gobierno democrático, nunca ha aprobado un Código de Ética Legislativa. Esa es su prerrogativa por ser función exclusiva de esa rama. Los poderes disciplinarios sobre sus miembros, sin embargo, están limitados por las Secs. 9 y 21 del Art. III de la Constitución del Estado Libre Asociado que solamente reconocen como causales para la separación del cargo la traición, el soborno, otros delitos graves, y aquellos delitos menos graves que impliquen depravación. Para ello requiere un juicio de residencia que necesita la concurrencia de dos terceras partes del número total de los miembros de la Cámara de Representantes para formular acusación y al pasar al Senado para juzgar y dictar sentencia no podrá pronunciarse fallo condenatorio sin la concurrencia de tres cuartas partes del número total de los miembros que componen el Senado. La opinión del señor Juez Presidente refleja, luego de un análisis de los intentos realizados

---

([3]) Véase *N.C. Freed Co., Inc.* v. *Board of Governors of Fed. Res. Sys.*, 473 F.2d 1210, 1217, escolio 23 (1973).

en las distintas jurisdicciones estatales estadounidenses para implantar códigos de ética legislativos, que los esfuerzos han sido fallidos. Pero no perdamos de vista que la intervención de este Tribunal nunca podría entrar en los problemas de ética de los legisladores. Nuestra función se limita a los abogados, sean o no legisladores. La expresión que se hace en la opinión del señor Juez Presidente al efecto de que "[n]o hemos hallado instancia alguna en Estados Unidos en que el Poder Judicial se haya arrogado la facultad, sin beneficio de estatuto, de convertirse en árbitro moral de la conducta de los legisladores." no se refiere a los abogados sino a los legisladores en general. Mi preocupación, sin embargo, está limitada a la conducta de abogados que bajo el manto protector de ser a la vez legisladores, pueden atentar contra la fe en la justicia. La separación de poderes no está en juego. Lo que está en juego es la separación de funciones de un abogado que es legislador. Es doctrina elemental que este Tribunal constitucionalmente no puede intervenir con el legislador como tal, pero sí tiene el poder inherente, como he señalado antes, para regular sus actuaciones como abogado. Dentro de esa facultad está la de evitar que el abogado se coloque en la posición de que pueda dar la impresión o apariencia de conducta impropia. De haber estado en vigor la norma ética que propongo en esta opinión nunca se hubieran dado las circunstancias que provocaron el caso ante nos. En este caso no se trataba meramente de un abogado que postulaba en los tribunales siendo legislador. Tal actuación no era entonces censurable ya que no existía norma que lo impidiera. El caso envolvía unas actuaciones impropias que enérgicamente censuramos de un abogado legislador. El Tribunal se limitó entonces a establecer una norma profiláctica que hoy deja sin efecto.

La rama judicial, a diferencia de la rama legislativa, amparada en sus facultades para ello promulgó un Código de Ética Judicial que rige la conducta de los miembros del foro y, en lo aplicable, a los funcionarios o empleados de los tribu-

nales. Véase 4 L.P.R.A. sec. 3; adoptado originalmente en 24 de septiembre de 1957; dejado sin efecto al aprobarse los nuevos cánones de ética judicial en 12 de mayo de 1977. Asimismo ha promulgado un Código de Ética Profesional que rige la conducta de los abogados, quienes tradicionalmente han sido considerados oficiales de los tribunales. Cánones de Ética Profesional, adoptados el 19 de julio de 1935.

En la función de oficiales del tribunal, de la que no están excluidos los abogados por el hecho de ser legisladores, este Tribunal viene obligado a velar por que la imagen del abogado refleje las mejores tradiciones de la profesión legal. Uno de los más altos ideales, bajo nuestro sistema democrático, consiste en que la ley debe dispensar igual justicia a todos los hombres, ricos o pobres, influyentes o no influyentes, humildes o grandes. Esto es, preservar derechos iguales para todos sin que haya privilegios especiales para algunos. Acepto que esos ideales se tornan muchas veces en quiméricos, pero son ideales a los que debemos aspirar, aunque las complejidades e imperfecciones de la sociedad no siempre permitan que se realicen.

No estimo necesario discutir los otros planteamientos del señor Presidente del Senado por considerar que ya han sido discutidos en la opinión disidente del Juez Asociado Señor Negrón García.

En el mejor espíritu de las expresiones que he hecho precedentemente y con la mayor deferencia a los compañeros abogados que con gran espíritu de sacrificio, devoción y dedicación cumplen un compromiso de servir al país, que es altamente encomiable, y en la esperanza que comprendan la preocupación que he expresado porque no se empañe su imagen como abogados, estimo que debía ampliarse la regla de incompatibilidad formulada por este Tribunal en su opinión de 9 de abril de 1976 que se limitó a declarar "una insalvable incompatibilidad en el ejercicio de la abogacía ante los tribunales de Primera Instancia . . . y el pertenecer a una Comi-

sión del Senado que tenga a su cargo la consideración de nombramientos de jueces o fiscales . . . ."

El Colegio de Abogados de Puerto Rico no se ha manifestado oficialmente sobre esta controversia, pero podemos tomar conocimiento judicial de la preocupación existente entre un sector del Colegio, que se palpa a través del Informe que rindió a la Junta de Gobierno del Colegio una comisión especial designada al efecto en torno a la citada norma de ética profesional. El referido informe recomienda a la Junta de Gobierno, entre otras cosas, que debe ampliarse la norma "para incluir la postulación del abogado legislador ante agencias administrativas y ante el Tribunal Supremo de Puerto Rico."

La fe en nuestro sistema democrático de gobierno y la fe en la justicia que es la base fundamental del sistema exigen que se adopten medidas para preservar la integridad de nuestro sistema judicial. El Tribunal preocupado por ello adoptó la norma de incompatibilidad que hoy deja sin efecto que se circunscribe a los abogados que son miembros de la Comisión del Senado que tiene a su cargo la consideración de nombramientos de jueces y fiscales.

Aunque se deja sin efecto esa norma limitada, reitero mi convicción de que la norma debe ser extendida a todos los abogados que a su vez sean legisladores, y ampliada para impedir su postulación ante todos los tribunales de justicia, bien sean de primera instancia o apelativos, y ante agencias y organismos administrativos y cuasi judiciales.

La norma propuesta encaja dentro del espíritu que encarna el Preámbulo del Código de Ética Profesional que rige la conducta de los abogados y de los Cánones de Ética Profesional Núms. 6, 11 y 38. De adoptarse, sus efectos habrán de ser prospectivos para tener vigencia al comienzo del próximo cuatrienio de la Asamblea Legislativa a los fines de que los abogados que deseen postularse para formar parte de esa Asamblea Legislativa estén informados de las restricciones que habrán de limitar su ejercicio de la abogacía.

—0—

Voto particular del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 31 de enero de 1978

Concurro con la resolución que hoy toma el Tribunal de dejar sin efecto la norma de incompatibilidad que aquí nos ocupa, pero no porque entienda que no tenemos el poder para adoptarla y que ella viole el principio de separación de poderes. La norma no afecta la función legislativa. Afecta a aquellos abogados que siendo miembros de la Comisión de Nombramientos del Senado no tengan el escrúpulo de abstenerse de postular ante nuestros tribunales y ante aquellos jueces en cuyo proceso de nombramiento y confirmación han de intervenir.

Sustento el criterio expresado en las opiniones de los Jueces Martín y Negrón García de que la adopción de la norma es parte del poder inherente de este Tribunal para reglamentar la profesión de abogado. Me mueve, sin embargo, a que dejemos en suspenso la norma, las expresiones hechas en el alegato del Presidente del Senado en que reconoce sus bondades y "la elevada intención de moral pública" que su contenido informa, y la esperanza de que ello sea indicio del propósito legislativo de adoptar en breve plazo el Código de Ética que tanto preocupó a los miembros de la Asamblea Constituyente.

—0—

Opinión disidente del Juez Asociado Señor Negrón García, a la que se une el Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 31 de enero de 1978

Luego de una profunda reflexión, respetuosamente, pero con vehemencia, disiento. La Resolución de hoy—producto de tres ponencias y criterios disímiles que convergen hacia una misma disposición—representa un retroceso histórico en los

horizontes del campo de la ética del abogado puertorriqueño y afecta los cimientos del Tribunal como intérprete de nuestra Ley Fundamental y los Cánones de Ética Profesional. De un lado la opinión del Juez Presidente, Señor Trías Monge—a la cual se unen los Jueces Asociados Señores Dávila y Torres Rigual—reconoce el "desencanto" de los métodos tradicionalmente ensayados en la jurisdicción norteamericana para la solución de los problemas éticos que conlleva el ejercicio de la profesión por el abogado legislador, percibe el "soplo de brisas de cambio" en cuanto atribuirle carácter absoluto al privilegio de inmunidad legislativa y además acepta que por inacción legislativa nada fundamental ha ocurrido en el presente siglo; no obstante, con *elegantia juris* lamentablemente rehusa concluir que en el panorama constitucional del país, la Convención Constituyente rechazó la noción de privilegios para abogados legisladores postulantes. Y por otro, las opiniones separadas de los Jueces Asociados Señores Martín e Irizarry Yunqué—que aun coincidiendo con este disenso en el extremo relativo a la existencia del poder inherente del Tribunal para reglar la cuestión—por distintos fundamentos, están de acuerdo con la Resolución adoptada.

Como prólogo, tres supuestos básicos cristalizados en nuestra jurisprudencia apuntalan esta disidencia: el primero, formulado con clarividencia jurídica hace más de medio siglo, a saber, que "[l]os abogados que se sientan en la Legislatura son también funcionarios de esta corte [y . . .] tienen un doble deber", *Claudio* v. *Ortiz,* 29 D.P.R. 435, 443 (1921); el segundo, más antiguo pero de igual valía, que propugna la cualidad de "buen carácter moral" como requisito indispensable para el ejercicio de la abogacía, *In re Abella,* 14 D.P.R. 748, 751 (1908); y el tercero, que ". . . [l]os abogados deb[en] evitar hasta las apariencias de lo malo, y especialmente en el ejercicio de la profesión ante las cortes y conservar sus togas libres de toda posibilidad de contaminación."

*Negrón et al.* v. *El Superintendente de Elecciones*, 11 D.P.R. 366, 370–371 (1906).

En decisión *per curiam* fechada 9 de abril de 1976 en el caso de epígrafe enunciamos el siguiente pronunciamiento ético:

"En virtud de nuestra facultad constitucional e inherente de reglamentar la profesión de abogado, y en el ejercicio de nuestra indelegable obligación de irle dando contenido concreto a los principios enunciados en el Código de Ética Profesional, *resolvemos que existe una insalvable incompatibilidad en el ejercicio de la abogacía ante los Tribunales de Primera Instancia—directamente o mediante asociados o-delegados—y el pertenecer a una Comisión del Senado que tenga a su cargo la consideración de nombramientos de jueces o fiscales.*" (Bastardillas nuestras.)

En extenso, razonado y documentado alegato, el Presidente del Senado de Puerto Rico[1]—quien no cuestiona las bondades y elevada intención de esencial moral pública que informa el contenido de nuestra norma—ha persuadido a una mayoría del Tribunal de que la abandonemos por interacción de votos resultantes fundados en los siguientes criterios tripartitos: (1) ser inconstitucional por trascender la autoridad del Tribunal e intervenir con una facultad exclusiva del cuerpo legislativo; afectar adversamente el descargo de las obligaciones asignadas por la Constitución al Senado de Puerto Rico; y representar una violación a la inmunidad legislativa; (2) ser una norma imperfecta e incompleta que debe ampliarse; y (3) la expectativa y confianza de que las Cámaras Legislativas actúen.

Consciente del reclamo de poder que conlleva y lo delicado del problema, se escribe esta disidencia con toda consideración a tales criterios jurídicos, reconociendo su importancia y el interés que siempre ha despertado en el ambiente profe-

---

[1] Mediante Resolución al efecto el Tribunal accedió a una solicitud de sustitución promovida por su actual Presidente, Hon. Luis A. Ferré. El alegato fue publicado en el Vol. 38, Núm. 1, Rev. Jur. C. Abo. 7-75 (1977).

sional las veces que se ha suscitado, produciéndose posiciones antagónicas, a veces con exaltada pasión. Las conclusiones expuestas no deben estimarse como menguante de la acostumbrada deferencia hacia el Poder Legislativo y sus miembros. Obviamente son sin perjuicio, como se intima en el alegato y poderosamente sugiere una pluralidad de magistrados del Tribunal, de que dicho foro adopte integralmente otras reglas de conducta incluyendo un Código de Ética para todos los legisladores según ha sido el interés manifestado de muchos, tanto en el pasado como presente, [2] preocupados más allá de las fronteras que trascienden las complejas teorías sobre deontología profesional. [3]

---

[2] Próximo a cumplir un cuarto de siglo de estar vigente nuestra Constitución, los esfuerzos han sido infructuosos. Véanse: Res. Conc. de la Cámara Núm. 13 *Diario de Sesiones* págs. 1932, 1935, 1936, 1950 (1964); Res. Conc. de la Cámara Núm. 1, *op. cit.*, pág. 158 (1965); Res. Conc. del Senado Núm. 3, *op. cit.*, págs. 61, 177. En el año 1968 se discutió la Res. Conc. del Senado Núm. 38, *Para establecer un Código de Ética para los Legisladores del E.L.A.*, que en lo pertinente proponía:

"h) El legislador no comparecerá ante los tribunales de justicia de Puerto Rico a representar intereses particulares de cualquier naturaleza en casos civiles en que el Estado sea parte o en casos en que exista conflicto de interés o de política pública entre el Estado y dichos intereses particulares, sin que se entienda comprendida en esta prohibición los casos de litigación de pobres que deba atender dicho legislador gratuitamente en cumplimiento de su fideicomiso público. No comparecerá tampoco ante las corporaciones públicas, agencias o instrumentalidades del gobierno de Puerto Rico a representar intereses particulares, sin que se entienda asímismo comprendida en esta última prohibición los casos de litigación de pobres que deba atender dicho legislador gratuitamente en el cumplimiento de su fideicomiso público.

. . . . . . . . .

"k) El legislador, cuando comparezca ante los tribunales de Justicia, cumplirá razonablemente con los calendarios fijados por el tribunal.

. . . . . . . . .

"n) El legislador se abstendrá de abusar de su privilegio de inmunidad parlamentaria tanto cuando tenga que referirse a sus compañeros legisladores como a cualquier otra persona relacionada con el Gobierno o persona particular; deberá mantener una conducta oficial y personal que mantenga el buen crédito y el respeto público que merece el cuerpo político al cual pertenece." 22 Pte V *Diario de Sesiones*, 2154–2155 (1968).

[3] "Deontología (etimológicamente es igual a ciencia o tratado de los deberes) estudia los deberes que atañen a una determinada profesión. El

## I

*Facultad Constitucional Tribunal Supremo Reglamentar Profesión Abogacía—(Admisión, Disciplina y Normas Éticas)*

Primeramente, no se cuestiona persuasivamente la facultad del Tribunal Supremo para reglamentar en sus distintos aspectos la profesión de abogado. (⁴) Innumerables decisiones antes y después de la aprobación de la Constitución, sostienen ampliamente que ". . . la remoción, al igual que la admisión al ejercicio de la abogacía, es facultad inherente de la rama judicial . . . ." *In re Liceaga*, 82 D.P.R. 252, 255 (1961); *In re Andréu Ribas*, 81 D.P.R. 90, 121 (1959); *In re Pagán*, 71 D.P.R. 761, 763 (1950); *In re Abella*, 67 D.P.R. 229, 238 (1947); *In re González Blanes*, 65 D.P.R. 381, 390–391 (1945); *In re Bosch*, 65 D.P.R. 248, 251 (1945); *In re Arroyo Rivera*, 63 D.P.R. 796, 798 (1944); *Guerrero* v. *Tribunal de Apelación*, 60 D.P.R. 241, 247–252 (1942); *Ex parte Jiménez*, 55 D.P.R. 54 (1939); *In re Tormes*, 30 D.P.R. 267, 268 (1922). La razón fundamental para esta doctrina quedó claramente expuesta en *In re Díaz*, 16 D.P.R. 82, 92 (1910):

---

nombre fue puesto en boga por Max Simon en su ya clásica obra dedicada a la profesión médica, *Deontologie medicale*, publicada en París en 1845. Siguiendo sus huellas aparecieron una serie de tratados concernientes a otras profesiones. El término vino a sustituir o a emplearse como sinónimo del de Ética o Moral Profesional. En el campo jurídico el pionero fue el belga J. Salsmans con su obra—publicada originariamente en flamenco y traducida por el mismo autor al francés—de *Droit et morale*. Deontologie juridique (19) (París, 1925). En ella 'se encuentran los principios generales (morales) aplicables y aplicados a las diferentes cuestiones' del Derecho civil belga. En éste su mérito principal y su originalidad." Alvarez Arias C., *Ética Profesional del Jurista*, 11 Rev. Der. Puertorriqueño, 352 (1964).

(⁴) En el alegato se acepta que ". . . la realidad histórica es que dicho poder ya está establecido y constituye un aspecto aceptado de nuestro sistema jurídico. El Tribunal Supremo reclamó ·dicho poder desde el 1911, como hemos apuntado, y lo ratificó en un número de decisiones anteriores a la Convención Constituyente. *La Convención Constituyente tenía conocimiento de ese reclamo, y si bien no otorgó expresamente en el texto de la Constitución el poder referido, tampoco lo rechazó expresamente.*" Págs. 12–13. (Bastardillas nuestras.)

"[l]a misión de los abogados en la sociedad es altamente noble, pues están llamados a auxiliar a la recta administración de justicia. En ellos confían, no sólo las partes interesadas en los pleitos, sino las cortes mismas." Recientemente reiteramos que "[s]u misión como tal no se limita meramente a representar intereses privados—en este caso los suyos—sino a ser un instrumento leal y eficaz de la administración de la justicia y del orden en nuestra sociedad." *Martínez Rivera* v. *Sears, Roebuck*, 98 D.P.R. 641, 652 (1970).

Un miembro actual del foro puertorriqueño, en sus estudios académicos iniciales, trazó la trayectoria jurisprudencial de la siguiente forma:

"El procedimiento de disbarment se instituye por las cortes en el ejercicio de su poder inherente para disciplinar a los miembros del foro. A este respecto se expresó nuestro Tribunal Supremo en el caso de *In re Arroyo Rivera,* 63 D.P.R. 796, 798, diciendo que '. . . no hay duda en cuanto al poder inherente de este tribunal para desaforar o tomar cualquier otra medida disciplinaria contra los miembros del Foro de esta corte . . . .'. Ese poder de desaforar y disciplinar a los miembros del foro nace como consecuencia o resultado de la facultad, también inherente, que tienen las mismas cortes para admitir aspirantes al ejercicio de la profesión de abogado. Siendo un poder inherente de las cortes, se dijo en *Ex Parte Boneta,* 39 D.P.R. 154, 160, '. . . el poder para admitir aspirantes al ejercicio de la profesión [de abogado] es judicial, y no legislativo'. Y en *In re Pagán,* 71 D.P.R. 761, 763, señaló el Tribunal que 'la admisión al ejercicio de la abogacía, es facultad inherente de la rama judicial'. En consonancia con estos principios, nuestro Tribunal Supremo ha reiterado que ese poder no puede ser limitado ni restringido por la Legislatura.

Esta facultad de autorizar aspirantes a ejercer la profesión de abogado ha sido siempre prerrogativa del poder judicial en el derecho anglosajón. La razón detrás de este principio es que la corte debe protegerse a sí misma y proteger al público de abogados ignorantes y egoístas. El origen de esta facultad se remonta, según la opinión general, al estatuto de 4 Henry IV, c. 18 (1402)." Nota: Arroyo Elí B., *Facultad de la Rama Judicial Para Reglamentar la Profesión Legal,* Vol. XX, Rev. Jur.

U.P.R., 38–86 (Cita precisa 39–40 (1950). Véanse además: Toledo Alamo D., *Admisión al Ejercicio de la Abogacía,* 3 Rev. Jur. U.P.R., 244–247 (1934) ; Nota: Baragaño Amadeo R., *Los Procedimientos de Desaforo en Puerto Rico,* Vol. 30, *Idem.,* 271–283 (1961).

En segundo lugar, no es determinante, a los fines de la decisión que se nos pide de dejar sin efecto o modificar nuestro pronunciamiento, que el mismo se caracterice como un nuevo canon de ética que no pasó por el tamiz tradicional del Colegio de Abogados. Salvo circunstancias extremas e inaplazables que demanden rápida acción, dicho curso de acción será el que observaremos, aclarando que la encomienda legislativa a dicha institución de adoptar reglas de conducta profesional plasmada específicamente en su ley orgánica, [5] reconoce la naturaleza exclusiva y eminentemente judicial que posee este foro sobre la materia, al disponer taxativamente que tales cánones regirán "con la aprobación del Tribunal Supremo." Y como expresáramos en *In re Bosch,* supra, de nuestras decisiones poniendo en vigor dicha legislación, "no puede inferirse . . . que hemos cedido al Colegio el control de los miembros de nuestro foro." Pág. 251. En *In re Vélez,* 103 D.P.R. 590, 597 (1975), nos referimos a "nuestra *indelegable* función de imprimirle contenido a los valores éticos que acompaña el ejercicio de la profesión de abogado." (Bastardillas nuestras.)

En síntesis, el desarrollo doctrinal jurisprudencial antes y después de la Constitución, da base para sostener la facultad nuestra para reglamentar la profesión de abogado y de que la corrección y validez de una norma ética no puede hacerse depender exclusivamente de que sea aprobada por la Asamblea Legislativa o el organismo en que ésta haya delegado. "Y como el poder inherente del Tribunal Supremo no se deriva del poder legislativo, la causa de disbarment no tiene

---

[5] Ley Núm. 43 de 14 de marzo de 1932; 4 L.P.R.A. sec. 773, inciso (f).

que ser necesariamente una de las definidas en los estatutos, siempre que al abogado se le conceda una oportunidad de ser oído en su defensa." *In re González Blanes*, supra, pág. 391.

## II

*Historial de la Convención Constituyente*

La opinión del Juez Presidente examina el historial de la Convención Constituyente y concluye que se ". . . estaba reteniendo y aun fortaleciendo el privilegio de inmunidad parlamentaria y se dejaba intocado el ámbito de las incompatibilidades" contenidas en la Sec. 15, Art. III de la Constitución. [6] Para determinar la corrección o no de la anterior proposición es menester que veamos cuales fueron las razones precisas que se invocaron, descansando en las incidencias y debates de los forjadores de nuestra Ley Fundamental y siguiendo el método de hermenéutica observado en *García Passalacqua* v. *Tribunal Electoral*, 105 D.P.R. 49 (1976).

El debate se originó como consecuencia de la siguiente Proposición Sustituta del delegado señor Padrón Rivera:

"Ningún miembro de la Asamblea Legislativa podrá, durante su término intervenir, directa o indirectamente, como dueño, director, administrador o empleado en empresas que contraten obras o suministros con el gobierno insular o municipal de Puerto Rico." *Diario de Sesiones de la Convención Constituyente*, 786 (Ed. 1961).(*)

---

[6] El texto en vigor dispone:

"Ningún Senador o Representante podrá ser nombrado, durante el término por el cual fue electo o designado, para ocupar en el Gobierno de Puerto Rico, sus municipios o instrumentalidades, cargo civil alguno creado, o mejorado en su sueldo durante dicho término. Ninguna persona podrá ocupar un cargo en el Gobierno de Puerto Rico, sus municipios o instrumentalidades y ser al mismo tiempo Senador o Representante. Estas disposiciones no impedirán que un legislador sea designado para desempeñar funciones ad honorem."

(*) Carecemos de cualesquiera otros documentos relacionados con trámites internos previos ante la Comisión de la Rama Legislativa de la Convención Constituyente, los cuales lamentablemente no constan en la Biblioteca de este Tribunal. Nuestro análisis se basa en el legajo que aparece en

En oposición inicial el Presidente de la Comisión Legislativa (⁷) señor Negrón López expuso los siguientes argumentos principales:

"Recuérdese que votamos cada cuatro años; recuérdese que hay opinión pública en Puerto Rico, recuérdese que se denuncia a través de todos los medios de fiscalización que son, sin duda alguna, tribunas altas, en los periódicos de una prensa libre, cuya libertad habrá de garantizarse en este mismo estatuto, [en] la tribuna igualmente alta de las minorías que estarán representadas en el parlamento o en la Asamblea Legislativa de Puerto Rico; hay garantía de que se denuncien, suficientes garantías, situaciones como las que menciona el señor Padrón Rivera, que no existen.

. . . . . . . .

Una disposición de la índole de la que pretende el señor Padrón Rivera que se incorpore a la constitución, producirá, sin duda alguna, *la consecuencia inevitable de vedar la participación en la vida pública* a valiosos elementos de la industria y de los negocios en Puerto Rico.

Por último, ¿*Por qué no dejamos eso a la ley*? ¿Por qué tratar de inflexiblemente condenar, haciendo abstracción de la aportación que podrían hacer esos individuos a la vida pública del país, condenar hombres que pueden ser útiles a que no puedan participar, *porque no confiamos en la Asamblea Legislativa que puede tratar estos casos particularmente* . . . ." *Diario de Sesiones, op. cit.*, 788–89. (Bastardillas nuestras.)

Luego del delegado señor Reyes Delgado argumentar a favor de la propuesta y exponer su criterio de que la disposición debería incluirse en la Constitución, *op. cit.*, 790, el delegado señor Gutiérrez Franqui se opuso aduciendo:

"Me parece peligrosísimo *una disposición estricta y rígida* como ésta *en la Constitución* que no permita flexibilidad a la Asamblea Legislativa para establecer las normas que puedan

---

la citada obra. No obstante, su examen apoya indubitadamente las conclusiones expuestas en esta disidencia.

(⁷) Dicho delegado posteriormente varió su parecer y promovió esta enmienda en particular. *Op. cit.*, 1095–1098.

ser saludables y necesarias, sin perjudicar fundamentalmente los derechos del pueblo a obtener productos y servicios.

Por esa razón creo *no debe llevarse a la Constitución* ese lenguaje, *que es claramente materia propia de legislación." Diario de Sesiones, op. cit.,* 791. (Bastardillas nuestras.)

Al reiterar su posición el delegado señor Negrón López expresó:

"Cuando [se] quiera insertar disposiciones de índole punitiva, el derecho le indica que el sitio donde debe insertarlas es el Código Penal. Cuando . . . *quiera insertar disposiciones preceptivas de índole moral,* o que delimiten jurisdicciones, o que confieran poderes, búsquese el Código Político. Y si quiere hacer leyes de índole civil, insértelas en el Código Civil. *Pero no es necesario imponer una condición, establecer una disposición en la Constitución* . . . ." *Op. cit.* 794. (Bastardillas nuestras.)

Sometida a votación, la enmienda del Sr. Padrón Rivera fue derrotada.

De rigor un paréntesis para hacer constar que esta proposición: (a) contemplaba una regla general prohibiendo a todo legislador prestar servicios al Gobierno o Municipios; (b) se estimó que su ámbito vedaba "valiosos elementos de la industria y de los negocios"; y (c) se consideró que no era materia propia para elevarse a rango constitucional, sino asunto a ser apreciado por futuras legislaturas en casos particulares.

En resumen, es evidente que los reparos específicos a la propuesta del señor Padrón Rivera estuvieron basados en razones de índole técnico-parlamentaria formuladas en el criterio de no ser materia apropiada para ser perpetuada en la Constitución y constituir una de carácter demasiado rígido e inflexible. Como corolario, no hubo expresión alguna contraria al contenido intrínseco de alta moral pública que proyectaba ni oposición a que el asunto pudiera ser objeto de legislación especial.

Inmediatamente después de derrotada la enmienda, el de-

legado señor Gelpí promovió otra nueva concebida en los siguientes términos:

"Desde la vigencia de esta Constitución ningún legislador podrá representar a cualquier municipio, o al pueblo de Puerto Rico, sus autoridades, corporaciones u organismos, a menos que lo haga en su carácter exclusivo de legislador." *Op. cit.*, 796.

Esta propuesta fue refraseada por el delegado Rivera Colón con el allanamiento del Sr. Gelpí. Su texto final proponía:

"Ningún miembro de la Asamblea Legislativa podrá ocupar un cargo civil en el gobierno de Puerto Rico, sus instrumentalidades o municipios durante su incumbencia, ni podrá recibir compensación de índole alguna de ningún departamento, agencia o instrumentalidad del Gobierno de Puerto Rico, ni de sus municipios. Tampoco podrá intervenir, directa o indirectamente, en ningún asunto, controversia o reclamación de naturaleza civil o administrativa en representación de otra persona, natural o jurídica, en que el pueblo de Puerto Rico o cualquiera de sus departamentos, agencias o instrumentalidades o [de] los municipios, sea parte interesada, excepto en el desempeño de sus deberes oficiales o en calidad de testigo; pero esta disposición no impediría el nombramiento de un miembro de la Asamblea Legislativa para desempeñar cargos ad honorem. Ningún Senador ni Representante podrá durante el término para el cual fue electo o nombrado, ser designado para cargo civil que se cree, o cuyo sueldo se aumente durante el mismo período." *Op. cit.*, 800, 1088–89.

Al defenderla, Rivera Colón hizo alusión al informe sometido por la Escuela de Administración Pública de la Universidad de Puerto Rico, del cual reproducimos:

"Estas leyes guardan silencio sobre el problema de si un legislador que sea abogado puede seguir ejerciendo libremente su profesión. Parece conveniente prohibir en forma expresa que un legislador-abogado patrocine casos contra el gobierno de cuyas leyes es coautor. Como dijera John Quincy Adams en su diario, 'se me ocurre que este doble carácter de abogado en corte y miembro de un cuerpo legislativo ofrece oportunidades y tentaciones para aceptar honorarios en contra de la pureza moral.'

Durante muchos años existió en Estados Unidos la práctica de que los Congresistas pudieran llevar, mediante honorarios, reclamaciones contra el gobierno sin que tal cosa provocara críticas ni censura. Pero en 1853 el Congreso legisló para hacer de esta práctica un delito menos grave. En nuestra Isla, con muy raras excepciones, los legisladores abogados continúan ejerciendo libremente su profesión, aún en casos contra el gobierno y en juicios por jurado. No cabe duda de que esto tiende a favorecer a su cliente, restándole pureza a los procedimientos judiciales por virtud de su influencia como legislador, que se ofrece como consecuencia necesaria de su presencia en la defensa, aún cuando no haya la intención de utilizarla. Creemos que en bien del interés público deben insertarse en nuestra Constitución disposiciones reglamentando la participación de los legisladores como abogados en casos contra el gobierno de que son parte y en casos de juicios por jurado sobre el que puede influir fácilmente la mera presencia del legislador." *La Nueva Constitución de Puerto Rico,* 373.

Aun cuando dicho delegado indicó no estar de acuerdo en todo su alcance con dicha recomendación, sí enfatizó la dimensión de elevada moralidad pública que la inspiraba:

"Mi moción, compañeros de Convención, es una moción de alta moral pública. *Vamos a consignarla en nuestra Carta Constitucional; vamos a dejar clara y específicamente consignado que los hombres que se dedican a la tarea de legislar, que deben ser hombres sin cortapisas y sin amarras.* Esa es misión de los hombres de altura moral. Y eso es lo que espera el pueblo de Puerto Rico de estos noventa hombres que están reunidos aquí en esta tarde, bregando con el problema más serio, con el problema de vida, con el problema futuro de todo este pueblo de Puerto Rico, que tiene los ojos puestos en nosotros, para que hagamos una cosa que valga la pena y que nos sintamos orgullosos en el mañana de haberla escrito y de haberla firmado." *Op. cit.,* 1094.

Subsiguientemente, el delegado señor Negrón López se hizo eco de la enmienda original del Sr. Padrón Rivera pero fue derrotado por una cuestión de orden estrictamente parlamentaria. *Op. cit.,* 1095–1098. Hasta ese momento, el asunto

no había sido definitivamente dispuesto, acordándose ulterior consideración. Más adelante el señor Rivera Colón aclara:

"Yo advertí que yo no tenía oposición de clase alguna a que los amigos que supieran de estas cosas, pusieran las frases que creyeran conveniente, y que cubrieran el concepto que yo expresaba. La enmienda, como sabe el señor Presidente y los compañeros de Convención, es una enmienda del compañero Gelpí, que fue enmendada por la enmienda mía. De manera que técnicamente es una enmienda del compañero Gelpí. Yo, naturalmente, no tengo inconveniente en que se salve ese principio, no me importa la frase o la manera en que se escriba. Naturalmente yo quiero hacer constar enfáticamente que yo no tengo ningún prejuicio absolutamente contra nadie, y que esto no solamente cubre abogados, sino que cubre a agricultores, a médicos, a profesionales, a todos los legisladores. Quiero que se entienda perfectamente bien este asunto. Yo no quiero que los amigos abogados vayan a creer que esta enmienda va dirigida a ellos, porque aquí puede haber médicos, ingenieros, agricultores, delineantes, de toda clase de profesiones; y a los amigos abogados, mucho menos [va dirigida], que son las personas con quienes yo consulto cuando me veo atrasado—como no tenemos consultas legislativas pues hay que ir donde los abogados para que le ayuden a uno. De manera que yo quiero hacer la aclaración de que no hay el propósito deliberado de que esto sea contra los abogados, sino contra aquellos que vayan a la [Asamblea] Legislativa, llámense como se llamen." *Op. cit.,* 1328.

Como secuela de este sentir, el delegado señor Polanco Abréu a nombre del señor Rivera Colón y el suyo propio, anunció que *retiraba* la enmienda. El señor Gelpí entonces indicó:

"Parece ser que hay el sano propósito por parte de todos de que conste en la constitución algo relativo con esta prohibición a los legisladores, sin que esto implique ni quiera decir . . . y yo soy el primero en reconocer que todos los legisladores merecen toda mi confianza personal y mi estimación. Así es que eso realmente es así como ha expresado el compañero Rivera Colón y como ha expresado el compañero Polanco Abréu. Se ha presentado aquí una enmienda, que ni siquiera fue secundada, por el compañero Gutiérrez Franqui, *si* ya hay ese propósito, entonces,

*yo consiento que se retire todo* y que vaya otra vez al comité para en la primera oportunidad redacten una enmienda que satisfaga a todo el mundo; *pero que figure en la constitución el principio ese." Op. cit.*, 1329. (Bastardillas nuestras.)

Con posterioridad, al ponerse a votación la enmienda del señor Gelpí es derrotada, no en virtud de los méritos intrínsecos o una mayoría siquiera simple, sino porque los delegados de la Asamblea Constituyente presentes[8] se dividieron en igual número, esto es, por razón de la regla técnico-parlamentaria de empate. *Op. cit.*, 1334.

A la luz del anterior y minucioso análisis del legajo de la Asamblea Constituyente, podemos concluir:

Primero: La norma ética de incompatibilidad expuesta en nuestro pronunciamiento no fue contemplada, como tampoco objeto de discusión ni rechazada;

Segundo: Los reparos de algunos de los participantes no fueron contra una norma específica, sino de metodología: (a) producto de una preocupación por su amplitud y (b) resultado del criterio de que ello no era materia para incluirse expresamente en la Constitución;

Tercero: Las objeciones giraron sobre una propuesta regla *general* de incompatibilidad para todos los futuros miembros del Poder Legislativo;

Cuarto: Una proposición en este sentido fue derrotada por razones de índole técnico-legislativa ·(empate) ; *no fue rechazada por sus méritos intrínsecos;*

Quinto: Se consideró que la materia no era para ubicarse en la Constitución, sino que podía ser objeto de legislación específica por ulteriores legislaturas; y

Sexto: En momento alguno se argumentó o vulneró la facultad inherente pre-constitucional que gozaba este Tribunal para reglamentar a los miembros del foro, aprobar en

---

[8] Cabe mencionar que del total de 82 delegados electos participantes en la Asamblea Constituyente, 34 eran abogados (41%).

última instancia los cánones de ética profesional, y darle contenido concreto a las normas de moralidad profesional.

Contrario a la tesis que se nos propone, el récord de la Constituyente arroja luz de que en ocasión de formularse un privilegio específico para abogados legisladores postulantes, el mismo fue taxativamente rechazado por el fundamento de que menoscabaría el concepto de independencia judicial diseñado en la Constitución. Este historial es palmariamente desfavorable a la posición esbozada de que nuestra Constitución permite la consagración de privilegios a abogados legisladores, especialmente en el área en que se manifiesta y proyecta en todo su rigor la norma ética que nos ocupa: la postulación ante los tribunales. A tal efecto, resulta revelador las razones que se adujeron para desaprobarse una propuesta —de carácter privilegiado—prohibiendo que un legislador fuera citado ante un tribunal durante cualquier período de sesiones en calidad de testigo o como abogado de una parte. *Op. cit.*, 765.

Del delegado señor José Villares reproducimos:

"[E]s un privilegio, hasta cierto punto, irritante. En Puerto Rico la carta de derechos que vamos a aprobar, que se ha propuesto ya, nuestra Carta Orgánica, todas las leyes dicen que el acusado tendrá derecho a un juicio rápido. ¡Mentira! El acusado tiene derecho a un juicio rápido, pero no quiere nunca, nunca quiere un juicio rápido. Es el juez, es la sociedad, es el fiscal, [el] que tiene que luchar contra el acusado para que tenga un juicio rápido. El acusado no quiere nunca, nunca quiere un juicio rápido . . . .

Que no se den privilegios a los abogados legisladores porque lo que pasa, señor Presidente y compañeros constituyentes, es que entonces, cuando vienen las sesiones legislativas, todos los acusados van [a ir] donde el legislador, donde el abogado legislador, a pedir que solicite la suspensión del juicio, aunque sea sólo para esos efectos; y después, el día del juicio, se cita al abogado legislador y comparece y dice que él no es el abogado más de aquel señor, porque solamente fue a los efectos de pedir, de obtener, de solicitar y de conseguir la suspensión del caso." *Op. cit.*, 767.

Y del Presidente de la Comisión de la Rama Judicial, señor Ramos Antonini, copiamos:

"Es en la discusión de esta rama de lo legislativo, donde las cuestiones que se debaten afectan más de cerca, en sentido personal, a los que estamos interviniendo en el debate. En lo de la rama judicial sólo podría entrar en juego la relación entre un poder y otro poder, pero no en el sentido individual. En la discusión de la rama ejecutiva también la situación de relación entre el poder ejecutivo y el legislativo, pero no en sentido individual.

*Ahora, la discusión relativa al poder legislativo y en estos artículos que estamos discutiendo, ciertamente se trata de privilegios y derechos, en carácter individual, de los miembros que componen las cámaras, y la prudencia aconseja que vayamos con mucho cuidado en la discusión y en la votación de estos privilegios.*

*Creo que esta moción que se debate va directa[mente], y es atentatoria, al ejercicio del poder judicial en Puerto Rico. Mientras por un lado esta Convención hace unos días aprobó el apartado de la rama judicial creando, a mi juicio, un poder judicial independiente, ahora se pretende quebrantar esa independencia, no en beneficio del poder legislativa ni en beneficios del poder ejecutivo, que estaría mal, sino más allá que eso [en beneficio] del poder del legislador que es el poder legislativo en sí."* Op. cit., 771.

"De manera que señalo esto como un principio ya consagrado en la jurisprudencia de Puerto Rico, que si bien no se extiende a la amplitud del caso que nos ocupa y si bien se trataba de ley y no de constitución . . . convertir en garantía constitucional lo que ya el Tribunal Supremo de Puerto Rico en una fase consideró que era atentatorio a la independencia del poder judicial, no le estaría haciendo bien alguno al pueblo de Puerto Rico, so pretexto de defender la dignidad de la [Asamblea] Legislativa a través de los miembros que la componen." *Op. cit.*, 772. (Bastardillas nuestras.)

En virtud de lo expuesto, es ineludible añadir una séptima conclusión: la Convención Constituyente rechazó expresamente el establecimiento de normas privilegiadas a los legisladores abogados por estimarse atentatoria a la independen-

cia judicial. Sumada ésta a las anteriores, es razonable concluir que la declaración sobre incompatibilidad formulada taxativamente en el Art. III, Sec. 15 de la Constitución es incompleta y no constituye una enumeración exhaustiva de todos los conflictos y supuestos éticos que pueden presentarse susceptibles de la reglamentación que ello exija. En consecuencia, ni el Poder Judicial (⁹) en lo concerniente a los abogados, como tampoco el Poder Legislativo con relación a sus miembros, están impedidos de ejercitar en sus correspondientes áreas de acción sus facultades constitucionales aprobando y haciendo extensivo a abogados y legisladores, respectivamente, las normas de conducta ética que las circunstancias en determinado momento precisen enunciar.

Desafortunadamente, una de las ponencias mediante la cual se logra el resultado de dejar sin efecto la norma, niega la validez de este análisis, y como generalidad incorrecta y fuera de perspectiva—pues sólo atañe al abogado legislador postulante—lo caracteriza como un poder de ". . . regente moral de la actuación de los legisladores en su capacidad oficial." Igual error se comete al plantearse como interrogante la existencia o no de "base para presumir que unos jueces, percibirán indefectiblemente, con mayor finura y precisión que los legisladores, las exigencias éticas de cada época respecto al comportamiento oficial de los senadores y representantes del país." Primeramente, el argumento olvida que la acción del Tribunal estaría limitada al legislador en su

---

(⁹) Con relación a la facultad de reglamentación debe observarse que distinto a nuestras decisiones judiciales sobre casos y controversias de carácter ordinario, al evaluar la conducta de un abogado en un trámite disciplinario, no sólo resolvemos el caso inmediato bajo nuestra consideración sino que a menudo exponemos y proyectamos de manera más amplia la norma y valor ético envuelto bajo la premisa de que "[C]ada abogado es un espejo en que se refleja la imagen de la profesión. Sus actuaciones reflejan ante la comunidad las bases del concepto que ésta se forme, no solamente del abogado en particular que actúa, *sino también de la clase profesional toda* que debe representar con limpieza, lealtad, y el más escrupuloso sentido de responsabilidad." *In re Coll Pujols*, 102 D.P.R. 313, 319 (1974). (Bastardillas nuestras.)

condición de abogado. En segundo lugar, pone en entredicho la indiscutible e histórica facultad constitucional de este foro, según apuntáramos al inicio de esta disidencia, de darle contenido ético a los Cánones que rigen la profesión. Tercero, tal posición contrasta marcadamente con la novel decisión de *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977), en que ante el lenguaje constitucional de que las cámaras serán "*el único juez* de la capacidad legal de sus miembros . . . ." expresamos que ello no "margina al Poder Judicial; no se le priva de jurisdicción sobre la materia." Y finalmente, de no actuar a cabalidad la Asamblea Legislativa, ¿se abstendría de hacerlo este Tribunal, hasta que los "tribunales estadounidenses resuelvan reducir en modo drástico el significado corriente del privilegio de inmunidad legislativa?" Con absoluta candidez confesamos que esta línea de pensamiento no merece ulterior argumentación.

## III

*Impacto Práctico*

Dirijimos nuestra atención a las preocupaciones y señalamientos relativos al impacto práctico de nuestro pronunciamiento en la composición del Senado y en el funcionamiento de la Comisión de Nombramientos Judiciales en el descargo de su función constitucional de considerar los nombramientos de jueces y fiscales (Art. V, Sec. 8, Constitución; Ley Núm. 23 de 24 de julio de 1952, 3 L.P.R.A. sec. 92).

Nuestro análisis refleja que no se ha afectado sustancialmente la tendencia y el número de abogados electos senadores en las últimas elecciones en comparación a los anteriores siete cuatrienios. Esta conclusión está sostenida en las Tablas I y II más adelante expuestas conteniendo el número de senadores abogados con relación al total de los senadores, y con referencia a la composición de la aludida comisión. A tal efecto, hemos ampliado la data computando el por ciento y añadido otro cuadro (Tabla III) ilustrando el número

total de senadores abogados en el Senado con relación al número de estos miembros de dicha comisión. Además, hemos tomado conocimiento judicial de la integración del Senado en el pasado y en la actualidad y los admitidos al ejercicio de la abogacía según nuestros archivos acumulando dicha información en las tablas. *Pueblo ex rel. Castro* v. *Padrón Rivera*, 60 D.P.R. 798, 810 (1942) y *Pueblo* v. *Casiano Vélez*, 105 D.P.R. 33 (1976).

## TABLA I

### NUMERO DE SENADORES–ABOGADOS CON RELACION AL NUMERO TOTAL DE SENADORES

| Cuatrienios | Senadores | Senadores Abogados | Por Ciento |
| --- | --- | --- | --- |
| 1949–1952 | 19 | 9 | 47 |
| 1953–1956 | 32 | 14 | 44 |
| 1957–1960 | 31 | 14 | 45 |
| 1961–1964 | 32 | 17 | 53 |
| 1965–1968 | 32 | 20 | 63 |
| 1969–1972 | 27 | 14 | 52 |
| 1973–1976 | 29 | 15 | 52 |
| 1977– | 27 | 12 | 44 |

## TABLA II

### NUMERO DE SENADORES-ABOGADOS–MIEMBROS DE LA COMISION DE NOMBRAMIENTOS CON RE- LACION AL NUMERO TOTAL DE MIEMBROS DE LA COMISION DE NOMBRAMIENTOS

| Cuatrienios | Miembros | Miembros Abogados | Por Ciento |
|---|---|---|---|
| 1949–1952 | 11 | 5 | 45 |
| 1953–1956 | 11 | 7 | 64 |
| 1957–1960 | 11 | 6 | 55 |
| 1961–1964 | 11 | 8 | 73 |
| 1965–1968 | 11 | 10 | 91 |
| 1969–1972 | 10 | 5 | 50 |
| 1973–1976 | 13 | 10 | 77 |
| 1977– | 12 | 5 | 42 |

## TABLA III

### NUMERO DE ABOGADOS EN SENADO CON RELA- CION AL NUMERO EN LA COMISION DE NOMBRAMIENTOS

| Cuatrienios | Senadores Abogados | Miembros Abogados | Por Ciento |
|---|---|---|---|
| 1949–1952 | 9 | 5 | 56 |
| 1953–1956 | 14 | 7 | 50 |
| 1957–1960 | 14 | 6 | 43 |
| 1961–1964 | 17 | 8 | 47 |
| 1965–1968 | 20 | 10 | 50 |
| 1969–1972 | 14 | 5 | 36 |
| 1973–1976 | 15 | 10 | 67 |
| 1977– | 12 | 5 | 42 |

De igual modo, presentamos la información correspon- diente a la Cámara de Representantes con miras a proyectar

la visión integral de la participación real e histórica del abogado en el proceso legislativo. ([10])

De la data acumulada se desprende que una vez realizados los ajustes iniciales, nuestra decisión *per curiam* no varió marcadamente el número de abogados electos al Senado como tampoco afectó el por ciento de miembros y el predominio tradicional de dicho profesional en la Comisión de Nombramientos y la capacidad para realizar su función. Aun cuando reconocemos que los resultados en los últimos comicios electorales es una muestra a corto plazo, y por lo tanto incompleta, sí es un indicador que nos permite razonablemente apreciar en este extremo las consecuencias del pronunciamiento ético. Distinto a las expectativas, no desanimó ni representó obstáculo para que muchos abogados, atraídos por este servicio público, postularan sus candidaturas y eventualmente fueran electos para dicho cuerpo. Tampoco impidió que distintos legisladores abogados pudieran pertenecer a la comisión. Ello es representativo de una concepción más amplia y altruísta de la función social del abogado puertorriqueño; concluir lo contrario sería eclipsar la abogacía y reducir la valía del escaño legislativo a un simple escalafón de interés personal profesional que nos negamos admitir.

Se aduce que la "participación de algunos abogados en dicho proceso [de confirmación a nivel de Comisión] es fundamental porque éstos están en mejor posición para evaluar las cualidades intelectuales y humanas que se requieren para desempeñar el cargo de juez." Esta proposición aparentemente correcta de su faz, no tiene el alcance atribuidole. La

---

([10]) *CAMARA DE REPRESENTANTES:* CUATRIENIO 1949–52, total miembros 39, total abogados 7=7%; CUATRIENIO 1953–1956, total miembros 64, total abogados 11=11%; CUATRIENIO 1957–60, total miembros 63, total abogados 13=21%; CUATRIENIO 1961–64, total miembros 64, total abogados 13=20%; CUATRIENIO 1964–68, total miembros 64, total abogados 13=20%; CUATRIENIO 1968–72, total miembros 51, total abogados 17=33%; CUATRIENIO 1973–76, total miembros 52, total abogados 15=29%; CUATRIENIO 1977–   , total miembros 51, total abogados 11=22%.

labor constitucional de aquilatar la idoneidad de los candidatos sometidos por el Primer Ejecutivo es una que corresponde en última instancia al Senado en pleno como cuerpo total en cuya función y deliberación intervienen otros miembros que no son parlamentarios togados. Para evaluar los nombramientos ejecutivos de jueces y fiscales, aunque conveniente, ciertamente no es indispensable el conocimiento previo dimanante de la postulación y experiencia forense. (¹¹) Los distintos elementos de juicio son susceptibles de ser producidos por otros medios que no expongan, ante la opinión pública la impresión de ascendencia particular tan dañina a la administración de la justicia.

No se nos escapa el argumento relativo a que si la norma es buena para unos, debe extenderse al proceso de decisión ante el cuerpo en pleno del Senado. Existe una marcada diferencia cuando se pertenece a una comisión específica que proyecta ante la opinión pública un poder especial y concentra toda la atención y creencia de posible influencia parlamentaria sobre la judicatura, a cuando la intervención es en el hemiciclo, diluído su ejercicio al votarse conjuntamente con los otros miembros del cuerpo que no son abogados. Como correctamente se expone en el alegato, "[l]a Comisión de Nombramientos es una parte muy importante del proceso y consejo y consentimiento de nombramientos judiciales. La Comisión entrevista al candidato. Todos los miembros tienen la oportunidad de hacerle preguntas y de auscultar su pensamiento y su carácter. Luego se prepara un informe recomendando o rechazando al candidato. *El nombramiento finalmente se considera en el hemiciclo y se resuelve con el voto de todos los Senadores. La recomendación de la Comisión*

---

(¹¹) Como cuestión de realidad, ante todo primer nombramiento a la judicatura, no es posible que el abogado legislador posea elementos de juicio valorativos excepcionales originados en haber postulado ante dicho candidato con anterioridad.

*tiene una influencia que puede ser decisiva en la votación
final.*" (Bastardillas nuestras.)

Aun bajo la hipótesis plasmada en una de las opiniones
que viabiliza el criterio mayoritario para dejar sin efecto
la norma de que nuestro pronunciamiento ético no fuera todo
lo perfecto que se deseara y el mismo no erradicara total-
mente la concepción equivocada pública de influjo o ventaja
indebida, ello no le restaría méritos. A nivel constitucional
no podemos convalidar la proposición de que el no poder resol-
ver totalmente un problema impide que se intente lograr
soluciones modestas y parciales. En el aspecto funcional y
operacional no se nos ha demostrado que realmente la Comi-
sión de Nombramientos esté imposibilitada de descargar efi-
cientemente su responsabilidad constitucional sin que necesa-
riamente pertenezcan abogados en el ejercicio activo de la
práctica privada de la profesión. Nos preguntamos: ¿Si en
determinado cuatrienio no fuera electo ningún abogado, sig-
nifica ello que se paralizaría el proceso constitucional de con-
firmación de jueces y fiscales? (¹²) Obviamente, se trata de
situaciones extremas, tan poco probables, como la remota po-
sibilidad de que en un futuro el Senado sólo quede integrado
de abogados postulantes o únicamente de abogados que nunca
han ejercido activamente la profesión ante los tribunales del
país.

Relacionado íntimamente con lo expuesto, es preciso exa-
minar la contención de que la norma ética atenta contra la

---

(¹²) El Decano Jaime Fuster observa:
"El segundo tipo de intervención [del abogado] es como consejero. Ya
sea como deponente en vistas legislativas, o como un funcionario de la ofi-
cina de servicios legales de la legislatura, o como un consultor especial con-
tratado para estudiar un problema en particular, el abogado participa para
asegurar una redacción efectiva de los estatutos, para lograr que los pro-
yectos de ley sean consistentes y estén en armonía con la legislación vigente,
y para delimitar lo que la legislatura puede o no puede hacer legalmente.
En cualquiera de estas funciones el abogado influye en la determinación de
la política pública." *La Misión del Abogado en el Mundo Contemporáneo,*
36 Rev. Jur. U.P.R., 585 (1967).

independencia legislativa al afectar ". . . el interés del pueblo electoral en que su selección de senadores sea de personas que van al Senado a desempeñar sus funciones como representantes del pueblo *en su totalidad y no a medias*, cumpliendo todas las funciones que le asigna la Constitución."

Podríamos especular y enumerar extensamente las razones y motivaciones que mueven al electorado para votar por determinado candidato al Senado, y el porqué éste se postula.([13]) Igualmente, múltiples factores intervienen en el resultado de unas elecciones generales. No obstante, en lo pertinente al caso, partiendo de la premisa de que los electores eligen sus representantes—incluyendo abogados, excepcionalmente cualificados para tan importante misión—con el fin y deseo principal de que legislen, tenemos que inferir que la dedicación activa de la profesión jurídica en la exigente([14]) área de la postulación ante los tribunales, forzosamente es una consideración secundaria, por no decir ninguna.

En su visión más amplia, el principio ético que nos ocupa en lugar de menoscabar el legítimo derecho y deseo de cada

---

([13]) "Aunque se podría argumentar que en este aspecto en particular los abogados no participan como abogados sino en su capacidad de políticos, puede afirmarse que la popularidad de los abogados con el electorado radica en parte en la noción popular de que la familiaridad de los abogados con la ley los califica especialmente para servir como legisladores. Parece ser claro también que la propensión de los abogados a servir como legisladores es fomentada parcialmente por su educación legal y por estar conscientes del beneficio que acrecerá a su práctica privada en virtud de su ocupación como legisladores. Estos hechos sugieren que el predominio de los abogados en los cuerpos legislativos es en parte el resultado de ser abogado. Sin embargo, no obstante este punto, el hecho esencial es que sí participan como legisladores en el proceso legislativo." Fuster, *op. cit.*

([14]) Para toda persona familiarizada con las exigencias específicas que requiere la constante tramitación de casos ante los tribunales—tales como investigación de hechos, entrevistas de partes y testigos, preparación de documentos, descubrimiento de prueba, comparecencia en las salas de justicia y otros—es evidente que el binomio de *abogado-legislador* y *practicante* es una ardua y compleja tarea. La lectura de los diarios de sesiones pone de manifiesto ocasiones en que el legislador tiene que solicitar se le excuse de participar en determinada sesión para poder asistir a un caso, o en la alternativa, pedir su suspensión.

elector a que su delegado ejerza su cargo "en su totalidad y no a medias", actúa a la inversa, esto es, promueve y permite al abogado legislador que pueda dedicar más tiempo a las responsabilidades representativas que conlleva la alta encomienda senatorial.

## IV

*Efecto sobre Cláusula Inmunidad Legislativa*

Réstanos considerar la argumentación y conclusión relativa a que nuestro pronunciamiento viola la cláusula constitucional sobre inmunidad legislativa.([15])

No albergamos duda de la importancia de esta disposición en nuestro sistema democrático de gobierno, dividido en tres poderes, cuya vigencia trasciende su valor histórico. La misma resulta esencial para el descargo de las funciones de todo legislador, vital para la independencia del Poder Legislativo y necesaria como protección contra las coacciones indebidas del Poder Ejecutivo o Judicial.([16]) En Puerto Rico, salvo *Ex Parte Lastra*, 56 D.P.R. 559 (1940), en que resolvimos que una ley definiendo los privilegios e inmunidades de los miembros de la Asamblea Legislativa no priva a los tribunales de hacer efectiva una sentencia de prisión por desacato contra un abogado legislador, no ha habido ocasión de interpretar los contornos y linderos de la inmunidad parlamentaria; sin embargo los casos y razonamientos en éstos expuestos bajo su concordante en la jurisdicción federal (Art. 1, Sec. 6), nos llevan a concluir que su cobertura debe ser lo más amplia posible a tono con los propósitos que la informan. En consecuencia, bajo la medida (*test*) de "esfera de activi-

---

([15]) Dispone *in fine:*

". . . todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones en una y otra Cámara o en cualquiera de sus comisiones." Art. III, Sec. 14.

([16]) *Diario de Sesiones, op. cit.,* 758.

dad legislativa" ($^{17}$) debemos examinar con absoluta ecuanimidad e imparcialidad los méritos de los planteamientos expuestos, los cuales básicamente se reducen a la siguiente proposición: la regla de incompatibilidad está en conflicto directo con la Constitución y su ejecución no es posible sin infringir la salvaguardia parlamentaria.

Advertimos que en la esfera federal se ha resuelto que el privilegio fue diseñado "para preservar la independencia legislativa, pero no la supremacía"; en ningún caso el Tribunal Supremo de los Estados Unidos "ha interpretado dicha Cláusula como protectora de toda conducta *relacionada* con el proceso legislativo", y no fue "su propósito hacer los miembros del Congreso super-ciudadanos . . . ." *United States* v. *Brewster*, 408 U.S. 501, 508, 515-516 (1972).

"No concebimos que sea prudente o sabio por una precaución exagerada de redoblar la garantía de independencia legislativa, extender el privilegio más allá del ámbito contemplado, su lenguaje literal e historial, para incluir todas las cosas que en una u otra forma están relacionadas con el proceso legislativo." 516.

Aclarado este extremo, a los fines de una mejor inteligencia es indispensable señalar que en el vasto campo de la ética profesional "[c]uando se habla de incompatibilidades, lo primero que debe suponerse es la existencia de alguna norma legal que establezca la prohibición del ejercicio de la abogacía y, a la vez, otra actividad, función o cargo. *Esas son, como se comprende, las incompatibilidades legales.* Sin duda, hay incompatibilidades de otro orden, por ejemplo, *moral* o material. *Si la incompatibilidad es de orden puramente moral la sanción es también moral;* si es material, en rigor debe ha-

---

($^{17}$)*Eastland* v. *United States Servicemen's Fund,* 421 U.S. 491 (1974) y casos citados: *Doe* v. *McMillan,* 412 U.S. 306, 312-313 (1973); *United States* v. *Brewster,* supra; *Gravel* v. *United States,* 408 U.S. 606, 623 n. 14 (1972); *Powell* v. *McCormick,* 395 U.S. 486, 502-503 (1969); *Dombrowski* v. *Eastland,* 387 U.S., at 84-85; *United States* v. *Johnson,* 383 U.S. 169, 184-185 (1966); *Barr* v. *Matteo,* 360 U.S. 564, 569 (1959).

blarse de imposibilidad de hecho." Bielsa, *La Abogacía*, 181 Tercera Ed. (Bastardillas nuestras.) ([18])

Hemos de admitir que la cláusula de inmunidad cobija a todos los senadores—sean abogados o no en el ejercicio de la práctica profesional—que integran la Comisión de Nombramientos del Senado. En la medida en que nuestro pronunciamiento se entendió como una prohibición absoluta a que el abogado legislador pertenezca *per se* a la misma, debe quedar aclarado que nuestro enfoque representa una norma de ética óptima que cubre la *intervención* en dicha comisión de los abogados legisladores que se dedican al ejercicio activo de la práctica de la profesión con relación a los nombramientos de jueces y fiscales; no implica que les está vedado el pertenecer a la referida comisión ni de participar en el proceso deliberativo de otros nombramientos ejecutivos.

En estas circunstancias, aun cuando la norma de incompatibilidad toca en un extremo una esfera de actividad legislativa legítima, ciertamente no es exclusiva de dicho ámbito, sino que cobra vigencia, se justifica y manifiesta por razón del ejercicio de la práctica privada de la profesión de abogado del legislador en la órbita de los tribunales y en orden a la

---

([18]) "Se entenderá por normas morales, aquellas que su cumplimiento queda exclusivamente a cargo de la conciencia, única instancia de procurar su cumplimiento. Para caracterizar a esta intervención tal vez no sea acertado hablar de la coacción de la conciencia, por más que la conciencia exija la observancia del ordenamiento moral. Por normas legales se entenderá que son aquellas caracterizadas por su fuerza obligante y su coacción, acompañadas por la sanción penalizadora al no cumplirse con ellas. Con base en el rasgo de la coactividad diré que el derecho se impone al amparo de una fuerza coactiva exterior, mientras que hay normas que no pueden ser impuestas mediante coacción exterior alguna, puesto que ordenan una actitud interior, a las que llamaré normas morales y que integran un ordenamiento moral. Así resultará que la esencia de las normas morales será el de que su observancia no es susceptible de ser promovida mediante coacción exterior." Avilés Rodríguez, *Responsabilidad Legal y Moral del Abogado, del Juez y del Ciudadano en la Administración de la Justicia*, 29 Rev. C. Abo. P.R. 119, 120 (1968–69).

observancia de los deberes correlativos que ello implica. ([19])
En ese sentido la situación jurídica es análoga a la hipótesis
fáctica relacionada con la efectividad y juridicidad de un de-
sacato o una sanción de tipo económico impuéstale a un abo-
gado legislador por no haber asistido a un señalamiento de
un caso notificado con antelación, independientemente de que
adujera en su apoyo como eximentes, compromisos reales ante
el hemiciclo o una comisión del Senado. No cabe entonces
sostener el privilegio de la inmunidad parlamentaria pues
produciría un problema constitucional, crearía desigualdades
ante los abogados y litigantes contrarios e "invadiría un
campo puramente judicial", *Claudio* v. *Ortíz*, supra, 443;
máxime ante el claro historial de la Asamblea Constituyente
contentivo de un rechazo hacia el establecimiento de privile-
gios a abogados legisladores. Concluimos, que inmunidad par-
lamentaria no significa inmunidad forense para el legislador
que siendo abogado opta por ejercer la práctica ante los tri-
bunales por diversas razones en circunstancias conflictivas
procesales o éticas.

"Pero—a poco que se observe—se verá que no basta para ser
abogado, el solo hecho de ejercer la profesión. Es preciso que
quien pretenda ser tal, cumpla ciertos requisitos, se someta a
ciertas exigencias normativas. Estas normas a las cuales debe el
abogado ajustar concientemente su conducta, son de dos órdenes:
a) legales; b) *morales o éticas*.

No nos referiremos a las primeras. Existen insertas al al-
cance de todos, en leyes orgánicas, códigos de procedimientos y
disposiciones dispersas. Son principios de orden público que rigen
su actividad profesional, cuya enumeración sería asaz, larga y

---

([19]) "Los derechos del abogado no son atributos exclusivos ni pre-
rrogativas; están equilibrados por deberes. Aún más: los deberes están en
primer término; no son sólo sus deberes de índole profesional, ya de carác-
ter ético, ya de carácter científico relativamente, sino, y sobre todo, aquellos
deberes de carácter público. Aún no reglamentada como ya debería estar
la profesión de abogado, ella es, en algún modo, de interés público, puesto
que actúa en la administración de justicia y coopera al mantenimiento del
orden jurídico. Precisamente esa función le crea incompatibilidades morales
y profesionales." Bielsa, *op. cit.*, 221.

tediosa, y ajena a la modalidad de este trabajo, por lo que me remito en este punto a las disposiciones expresadas. *Las segundas, constituyen valores morales superiores que se imponen a la conciencia como ineludibles, y la trascienden en un doble sentido: primero, entrando en ella procedentes del mundo ideal; luego saliendo de ella en forma de conducta.*" Iturraspe Bernardo, *Función Social de la Abogacía,* 124–125 (1967). (Bastardillas nuestras.)

Con este trasfondo, estamos convencidos de que constitucionalmente la regla no coarta ni restringe la función del abogado legislador quien está enteramente libre para ejercerla a plenitud en la Comisión de Nombramientos, si así elige. Cuando se decide servir dos o más vocaciones simultáneamente, el principio de igualdad—nervio de nuestras instituciones democráticas—no admite que el servicio de una autorice la inmolación de las otras. La inmunidad parlamentaria, respetable escudo que protege la irrestricta expresión y voto del legislador en defensa de los altos intereses a él confiados por los electores, está también gobernada por principios de moral y de orden públicos, algunos declarados, como la incompatibilidad entre el cargo de legislador y un empleo en el gobierno; o la prohibición de ocupar en el Gobierno de Puerto Rico un cargo civil creado, o mejorado en su sueldo, durante el término del legislador; y otros no declarados, pero de igual valía y vigencia. Todos son parte de nuestra ordenada libertad y tienen su génesis en el exordio constitucional de que en nuestro país el orden político está subordinado a los derechos del hombre y la "fe en la justicia" es factor predominante.

"La ética, la seguridad y la libertad por igual exigen que los servidores públicos estén sujetos a las mismas reglas de conducta que son órdenes para el ciudadano. En un gobierno de leyes, la existencia del gobierno estará en peligro si deja de cumplir la ley escrupulosamente. Nuestro Gobierno es el maestro poderoso y omnipresente. Para bien o para mal él enseña a todo el pueblo por su ejemplo." *Olmstead* v. *United States,* 277 U.S. 438, 485 (1928), opinión disidente.

Ahora bien, argüendo que la misma no pudiera ejecutarse debido a la cláusula de inmunidad parlamentaria, y en consecuencia ello excluyera el ejercicio de nuestra jurisdicción original disciplinaria constitucional, tal eventualidad no le restaría eficacia ni haría académica nuestra decisión por sus virtudes intrínsecas de profundo contenido moral. Conscientes del llamado que en el pasado se nos ha hecho, en lo concerniente a principios éticos debemos ejercer no solo la autoridad real sino la moral en cualesquiera casos apropiados. [20]

Debe tenerse presente que el pertenecer a una comisión parlamentaria no es un derecho absoluto de un legislador en el sentido de que ello depende de una designación expresa del Presidente del cuerpo correspondiente conforme al Reglamento vigente. El legislador no viene obligado a aceptar dicha encomienda si la misma violenta una norma de ética escrita preexistente o de conciencia, por razón de su profesión u ocupación, o debido a cualesquiera otros conflictos de naturaleza familiar o económica. Así lo contempla la Regla XXXIII, inciso 5, del Reglamento del Senado al reconocer una norma de inhibición moral, de naturaleza individual, que le permite salvar constitucionalmente sus escrúpulos en orden a un interés personal o de alta trascendencia moral. Dispone:

· "Todo Senador estará obligado a emitir su voto en los asuntos sometidos a votación, *y si tiene en ellos interés personal directo, deberá abstenerse de votar;* y podrá abstenerse, con el consentimiento del Senado, *por razones de alta trascendencia moral* o cuando no esté preparado para emitir su voto, por desconocimiento del asunto en discusión." (Bastardillas nuestras.)

## V

*Fundamentos Éticos del Pronunciamiento*

Los fundamentos del pronunciamiento ético surgen del siguiente lenguaje:

---

[20] Serrano Geyls, R., *Los Perseguidores de Ambulancias,* 28 Rev. C. Abo. P.R., 332 (1963).

"Finalmente, no podemos sustraernos a la realidad de que el Lcdo. Rodríguez Torres, en su dualidad de abogado y Presidente del Comité de Nombramientos del Senado, *ha intervenido en innumerables casos civiles y criminales* ante los tribunales de Primera Instancia. Tampoco podemos perder de vista que *subsiste la errónea creencia de que el abogado que ocupa una posición especial de poder en el proceso legislativo de pasar juicio sobre los nombramientos judiciales puede imponer sus criterios a los jueces.*

Los documentos ante nuestra consideración no contienen hechos de los que podamos inferir libres de error, que el querellado utilizara e hiciera sentir su posición como Presidente de la Comisión de Nombramientos en la intocable función de emitir un fallo justo.

No obstante, *la justicia debe ser inmaculada no solo en su realidad interior sino también en su apariencia externa.* Dicho principio está encarnado en diferentes disposiciones del Código de Ética Profesional. La prohibición establecida en el Canon 11 respecto a las influencias o presiones indebidas hacia jueces debe interpretarse a la luz de lo anterior como que *prohíbe también cualquier actuación que diese lugar a una apariencia de indebidas influencias.* En nuestro sistema de gobierno, '*donde la voluntad del pueblo es la fuente del poder público [y] donde el orden público está subordinado a los derechos del hombre', la confianza del pueblo en su sistema de justicia es de vital importancia para el mantenimiento de la armonía social y esto le impone a cada abogado, en cada instante de su gestión profesional, la más cuidadosa auto-disciplina de forma que evite siempre aun la más leve apariencia de actuaciones indebidas.*"

El texto transcrito aprecia en su justa, correcta y total perspectiva su esencia valorativa. Tres presupuestos la nutren, a saber: el ejercicio constante de la práctica intensa de un abogado legislador en los tribunales; la errónea visión y creencia pública de que dicho abogado legislador, por su posición especial, destacada y de prestigio como miembro de la Comisión de Nombramientos, puede afectar la administración de justicia; y de que en tales circunstancias, la apariencia—aspecto o parecer exterior—es tan dañina a la preservación

del honor y dignidad profesional([21]) como la conducta real anti-ética, que exige del abogado legislador auto-restricción. La norma necesariamente no está dirigida a evitar una posible indebida influencia real o imaginaria, sobre jueces y fiscales, sino a reducir y eliminar la noción pública equivocada de ventaja indebida.([22])

Compartimos el criterio de Parry, quien en su extenso análisis del problema sobre incompatibilidad rechaza el argumento de menoscabo a la integridad de los jueces expresando "[e]s verdad que los estudios de los dirigentes políticos allegados a las esferas del gobierno son los más concurridos y tienen mejores asuntos; ello es debido más que a la influencia que puedan ejercer sobre los jueces, *a la creencia popular de la existencia de tal influencia.*" 2 *Etica de la Abogacía*, 117 (1940). (Bastardillas nuestras.)

Esta noción y creencia de influencia impropia no sólo es del público en general al presente, sino que ha tenido eco en el pasado también entre la clase togada del país. Véase: Nota Editorial, *La Influencia del Legislador sobre los Tribunales de Justicia;* Rev. de Der., Leg. y Jur. del Col. de Abo., Vol. I, Núm. 6 (Mayo y Junio 1936). Cabe señalar de que no es privativa de Puerto Rico, sino universal.([23]) Bielsa, en su reputada obra *La Abogacía* expone:

---

([21])"El principio aplicado en dichas opiniones [16, 30, 34, 77, 118 y 134] es que el abogado que ostenta un cargo público debe evitar toda conducta que pudiera hacer creer a un lego que el abogado está utilizando su posición pública para promover su éxito profesional o interés personal." *A.B.A., Opinión 192* (1939).

([22])Tampoco es oponible la preocupación en torno a que una vez aceptado el principio envuelto se reglamente por el Poder Judicial ilimitadamente la postulación del abogado legislador ante las distintas agencias administrativas, pues bajo nuestro derecho vigente, toda determinación de un organismo administrativo puede ser objeto de revisión judicial, quedando de esta manera reducido y salvado el aspecto sobre noción pública errónea de influencia indebida ante los tribunales.

([23])Entre otra literatura consultada sobre ética profesional jurídica: Morgan & Rotunda, *Professional Responsibility* (1976); Wise, *Legal Ethics,* 2d ed. (1970); Roscoe Pound, *Law and Morals* (The McNair Lec-

"[Hay . . .] abogados legisladores, abogados altos funcionarios y abogados influyentes en los actos de gobierno y de administración. Entre esos actos están el nombramiento y el ascenso ,de los jueces y, al contrario, también su preterición. Esos abogados ejercen su profesión más o menos activamente, sobre todo en épocas de crudo predominio partidario. Y si la función política o. legislativa les impide una exclusiva dedicación a la profesión, otros abogados les sustituyen en ésta, o colaboran en sociedad o aparcería. Lo que se mantiene entonces es el poder e influencia del 'estudio'. Así, pues, con el advenimiento del partido al gobierno, el estudio de Fulano, o el de Zutano, ven de pronto aumentar la clientela en manera extraordinaria. *Lo que entonces busca el cliente no es un jurista; es un abogado en situación de 'lograr éxito' en el tribunal; es el abogado político; el abogado influyente; mejor aún, es la 'firma' de este abogado.*" *Op. cit.,* 377. (Bastardillas nuestras.)

En *Elogio de los Jueces,* Piero Calamandrei señala:

"La gente cree que el ejercicio de la política militante es, en los países libres, el complemento natural ,de la profesión forense, y que el mandato parlamentario confiere a los abogados más prestigio ante los jueces. ¡Es un error!" *Op. cit.,* 248–249 (1956).

Otro autor informa:

"Nuestra carrera debe ser incompatible con todo aquello que ponga en peligro la libertad o la conciencia.

Este problema ha suscitado contiendas enojosas, porque siempre se ha mezclado con cuestiones de intereses. Por encima de estas cuestiones 'aunque no se olviden las conveniencias, existe una cuestión moral que encierra extraordinaria importancia. Si el funcionario que es Abogado se acuerda de la Abogacía en sus funciones, deja de serlo. El no reconocerlo así constituye una inmoralidad. Y aquí entramos en el nudo del conflicto. *Por razón de su cargo, estos funcionarios pueden ensanchar la esfera del*

tures) (1969); Passi Lanza, *Breve Comentario de un Fecundo Congreso— Las Primeras Jornadas Nacionales de Etica de la Abogacía,* 130 Rev. Jur. Argentina La Ley, 949–956 (1968); Smith & Stevens, *Lawyers and the Courts* (1967); *Lawyer's Ethics,* Carlin & Rüssell Sage Foundation (1966); Mark M. Orkin, *Legal Ethics* (1957); *Legal Studies of the Opinions on Professional Ethics,* William Nelson Crownwell Foundation, Columbia University Press, N.Y. (1956).

*bufete: influencias, posibilidades de favores, un proteccionismo discreto, le otorgan categoría especial, que es siempre reconocida y bien pagada.*

Si contra esto no se dictan disposiciones conminatorias y se deja al libre juego de la vida, allá cada cual con su conciencia . . . . La tolerancia de los demás no puede salvar las impudicias cometidas . . . . Señalo el hecho; que cada cual recoja las consecuencias." Monge Bernal: *Justicia. La Novela de Un Abogado,* citado en Fernández, *La Abogacía en España y en el Mundo,* Vol. I, 194 (1955). (Bastardillas nuestras.)

Fernández clasifica y fundamenta como causas de incompatibilidad las dimanantes de la dignidad de la función; por razón de independencia; por razón de la igualdad en la defensa; y por las exigencias de la actuación profesional. Con referencia al caso de autos es menester reproducir la relativa a "la igualdad en la defensa", la cual representa la dimensión que nutre la errónea creencia pública de indebida influencia.

"Se trata aquí de la igualdad objetiva, como uno de los fundamentos básicos de la Abogacía, *cuyo ejercicio no admite privilegios.* Sin esta igualdad no hay libertad de defensa, y sin ella, la Abogacía sufre un grave quebranto. Por eso decía el Fuero Juzgo, al tratar de ese problema de igualdad, que por el miedo del poderío no desfallezca la verdad.

En relación con ello, no deben abogar quienes ocupan altos puestos jerárquicos en la Administración, quienes ejerzan funciones judiciales o fiscales, cualquiera que sea su denominación y grado—dice el Estatuto de la Abogacía, en su artículo 20—, los funcionarios y subalternos que tienen relación con la administración de justicia, y todos aquellos, en fin, que *por los cargos o funciones públicas que desempeñan pueden dar lugar a una desigualdad en la defensa.* No sólo por su influjo y 'poderío', sino también por disponer de medios excepcionales que la Ley puso en sus manos, por razón de sus especiales misiones, ajenas a todo interés privado." (Bastardillas nuestras.) Fernández, *op. cit.,* 174.

Y citando a Laguna Azorín, a este respecto, dice en relación con las incompatibilidades para el ejercicio de la Abogacía lo siguiente:

"Todo cargo que signifique jurisdicción, todo empleo que tenga relación con la administración pública, directa o indirectamente; toda actividad que refleje influencia positiva, debe yugular el ejercicio de la profesión, porque el compaginarlas se presta a servir de plataforma, por lo menos injusta, para construir rápidamente una reputación.

El ejercicio de la Abogacía tiene una función análoga a la del sacerdote, y ante él debe quebrarse el 'primun vivere' sin que sea lícito mezclar actividades que éticamente se repelen. *Bases para un Código de Ética Profesional de la Abogacía.*" Fernández, *op. cit.,* 176.

Como epílogo, si bien cabe admitir la diferencia del derecho y la moral como dos órdenes normativos separados, estando todo precepto jurídico en nuestra Constitución cimentado en una norma moral subyacente, en los conflictos concretos relativos a la ética de la profesión jurídica debemos restablecer la armonía dándole preminencia a lo moral. "El legislador no puede—racionalmente—colocarse en el supuesto de que el orden normativo que establece o contribuye a organizar llegue a ser apto para otorgar facultades cuyo ejercicio llegue a contrariar el orden moral . . . . Deja entonces al Juez la posibilidad de apreciar si esa actividad (formalmente lícita) debe ser amparada jurídicamente en razón de su contenido y fines." Mouchet C., *Los Conflictos Entre la Moral y el Derecho,* XX Rev. Jur. U.P.R., 7–8 (1950).

En consecuencia, no podemos suscribir la teoría constitucional de impotencia hoy refrendada, que acepta al presente la "situación insólita" de que el "diseño constitucional no se ha cumplido." Además, tal decisión, en esencia lesiona el principio moral que animó la conciencia ética del abogado(24)—que como figura clave, central y protagonista del diseño y plan constitucional vigente—repudió la consagración

---

(24) Bajo los razonamientos expuestos, a mi juicio resulta imposponible que todo abogado que pertenezca a la Comisión de Nombramientos Judiciales del Gobernador y su equivalente en el Colegio de Abogados examine si existe conflicto con la norma ética tutelada y adopte el curso de acción correspondiente.

de privilegios e inmunidades parlamentarias ante los tribunales de justicia y rehuyó la noción de cabildeador privado en su propio beneficio, honrando así una vez más la histórica y merecida confianza colectiva en él depositada.([25]) "El instinto de defensa y el sentido de la justicia han nacido con el hombre. Y la defensa en justicia, en el imperio del derecho, no se concibe sin el abogado. Es ese su elevado destino." Bielsa, *op. cit.*, 511.

La conjugación de los valores envueltos, "después de más de cuarenta años de debate" no permite a esta generación que descartemos nuestro pronunciamiento, pues como se indica en una de las opiniones, "[t]al parece que la Constitución, al igual que la naturaleza, aborrece el vacío."

"Ello no significa, sin embargo, que exista incompatibilidad entre el ejercicio de la profesión de abogado y el desempeño de una función legislativa. El mandato electivo no es inconciliable con el ejercicio de la profesión de abogado. No se trata aquí de una incompatibilidad propiamente dicha, sino solamente de la obligación para el abogado investido de un mandato electivo, de abstenerse escrupulosamente de todo lo que implique una confusión entre el ejercicio de su profesión y el cumplimiento de este mandato.

El abogado legislador o político, deberá señalarse por una cautela muy especial, preocupándose en todo momento de evitar que cualquier actitud o expresión suya, pueda ser interpretada

---

([25]) "Los campos profesionales se caracterizan además por la existencia de criterios ideales de superación, de objetivos que jamás se alcanzan en su totalidad, pero cuya incitación mantiene en forma a la clase profesional. Si esos criterios valorativos se descartan y si desaparecen las instancias ejemplares, se pierde la visión del debe ser y queda desmoralizada e invertebrada la profesión.

"Estos criterios del debe ser están relacionados también con la llamada ética profesional que en nuestros tiempos por desgracia ha subrayado más las consideraciones que se deben entre sí los profesionales que las obligaciones superiores contraídas con el público no profesional y con los valores indispensables a su ministerio. A fin de cuentas nuestra estatura profesional la determina la dirección en que se encamina nuestro proceder cotidiano, si hacia los ideales de excelencia o los ideales de conveniencia." Benítez, J., *La Función Social del Abogado*, 17 Rev. C. Abo. P.R., 233 (1957).

como tendiente a aprovechar su influencia política, o su situación excepcional como mandatario popular." Parry, *op. cit.,* 117.

## V

En síntesis, bajo el esquema y panorama constitucional vigente concluimos que: el Poder Judicial, representado por el Tribunal Supremo, tiene la facultad para reglamentar en sus distintos aspectos la profesión de abogado y promulgar normas de ética profesional; este atributo es concurrente con las prerrogativas que posee el Poder Legislativo de adoptar normas de conducta para los legisladores; modificaría nuestro pronunciamiento de incompatibilidad absoluta entre el ejercicio activo de la profesión de abogado ante los tribunales y el pertenecer a una Comisión sobre Nombramientos de jueces y fiscales a los fines de que ello no afecta el ser miembro e intervenir a dicho nivel en otros nombramientos [26] y; por su naturaleza intrínseca, como expresión moral de ética profesional subsiste, sin menoscabo de que la Asamblea Legislativa ejerza sus poderes y confronte el problema de conflictos de intereses de los legisladores de manera integral. [27]

---

[26] Su texto modificado leería del siguiente modo:

"Existe una insalvable incompatibilidad entre el ejercicio de la abogacía ante el Tribunal de Primera Instancia—directamente o mediante asociados o delegados—y la intervención, como miembro de una Comisión del Senado, en la consideración de nombramientos de jueces y fiscales pendientes ante dicha Comisión."

[27] Anotamos: la aprobación el 1ro. de abril de 1977 por el Senado de los Estados Unidos de América de un *Código Oficial para Regir la Conducta de sus Miembros* (Senate Resolution 110); como dato interesante, la inexistencia ante el Senado Federal de una Comisión de Nombramientos; y como antecedente congresional, la Ley Federal Sobre Conflictos de Intereses (18 U.S.C.A. secs. 204–18) que en lo pertinente dispone:

"Todo aquel que siendo miembro del Congreso, Miembro Electo al Congreso, Delegado del Distrito de Columbia, Delegado Electo del Distrito de Columbia, Comisionado Residente o Comisionado Residente Electo, *practicare en la Corte de Reclamaciones,* será castigado con una multa que no excederá $10,000.00 o recluido por un término que no excederá dos años, o ambas penas, y estará impedido de ocupar un cargo de honor, confianza o remunerado en los Estados Unidos." (Bastardillas nuestras.)

Así modificado, proveería no ha lugar a la solicitud para dejar sin efecto la misma.